**REACTION MOLDING TECHNOLOGIES, INC., t/a Rim/Precision**

v.

**GENERAL ELECTRIC COMPANY.**

Civ. A. No. 82–4970.

United States District Court, E.D. Pennsylvania.

July 18, 1984.

---

Arnold Borish, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for plaintiff.

Robert L. Archie, Jr., Atkinson, Myers, Archie & Wallace, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

On April 26, 1984, 585 F.Supp. 1097, I wrote an extensive opinion denying plaintiff's and defendant's motions for partial summary judgment and setting forth the law to be applied at trial.[1] I have tried the case without a jury. The following constitute my findings of fact and conclusions of law.

Plaintiff, a Pennsylvania corporation with its principal place of business in Pennsylvania, produces plastic parts by means of a process known as reaction injection molding. Reaction Molding Technologies (Rim) produces the parts from molds. Rim subcontracts to various subcontractors the construction of the molds used by Rim to produce its plastic parts.

Defendant is a New York corporation with its principal place of business in New York. I have diversity jurisdiction.

Count I of the complaint alleges that plaintiff and defendant entered into a contract in 1982 for the construction of four molds from which plaintiff would produce plastic parts for defendant to use in the construction of a medical equipment system, the CT 9800. This Count further alleges that defendant breached the agreement by unilaterally terminating the contract.

The parties agree that a contract existed between them. The only questions at trial as to Count I were the delivery dates of the contract and whether defendant unilaterally breached the agreement.

### I. Count I: Facts

Throughout 1981, GE requested that Rim prepare numerous quotations for the production of four molds from which parts were to be constructed for defendant. The four molds in question were to produce the covers for the right and left hand support arms, the small desk and the keyboard housing for the CT 9800. In response to the GE requests, Rim prepared various quotations in 1981 for production of the molds. Because of design changes at GE, however, GE never submitted a purchase order in 1981.

In February of 1982, GE sent to Rim another request for quotations. Rim prepared its quotations (Rim 1b–1e) which were received by GE on March 2 or March 3, 1982. On the bottom of the first page of all four quotations were the following terms:

One-third with order; one-third upon notification of mold completion; one-third upon approval of preproduction samples.

As to delivery of the covers for the right and left hand support arms, the quotations stated:

Delivery: Moldmaker's delivery approximately twenty-two weeks; pre-production samples to follow.

For the small desk and keyboard housing molds, the delivery terms were identical to those in the quotations for the cover parts with the exception that the approximate number of weeks quoted was sixteen and twenty weeks respectively. Cletus Roshak, the buyer for GE on this project, received the Rim quotations and understood that "one-third with order" meant that Rim wanted a one-third deposit. He also understood that Rim was going to subcontract the construction of the molds and that the word "approximately" in the delivery terms meant that the number of weeks quoted for delivery was not precise. On March 3, 1982, GE prepared a material requisition form (Rim 8) in order to obtain approval

1. This opinion amends my notion of the law to be applied in one respect. See pp. 1288–1289 *infra.*

from the necessary principals at GE for a purchase order. Although the form could have been rushed through the approval process in a week, it was not completed until March 22, 1982.

On March 22, 1982, Cletus Roshak, then recently hired buyer for GE, called David Michaelis, vice president of Rim, to tell him that GE was ready to submit purchase orders to Rim for the molds. Roshak told Michaelis that he could not give Rim a one-third deposit with the order because the GE system demanded an invoice before a check could be issued, but he promised that he would rush the check. Michaelis told Roshak that normally moldmakers would not begin work before receiving a deposit, and that he would not do anything until he saw the purchase orders. Because Roshak believed that GE could not process the purchase orders with an approximate number of weeks for delivery, but that a specific date was needed to put into the computer, he told Michaelis that he needed a date to put on the purchase orders. Roshak counted the longest approximate lead-time in the quotations—twenty-two weeks—from March 22, 1982 and came up with August 20, 1982. He told Michaelis that he would like to see improvement on the August 20 date.

Roshak prepared the GE purchase orders (Rim 9a–d). He had the following terms typed on the purchase orders:

> One-third with order; one-third mold completion; one-third upon approval and acceptance of samples.

Under the section labeled "delivery schedule", "8/20/82" was typed and Roshak wrote "or sooner" in longhand. In dark print at the bottom lefthand corner of the first page of the purchase orders was the following:

> SIGN AND RETURN THE ATTACHED ACKNOWLEDGEMENT PROMPTLY GIVING SHIPPING DATE IF DIFFERENT FROM ABOVE

The second page of the purchase orders was an acknowledgement form. In bold print was the following:

> THIS ACKNOWLEDGEMENT COPY IS PART OF OUR PERMANENT RECORD. PLEASE FURNISH DELIVERY DATE. SIGN AND RETURN PROMPTLY.

Roshak knew that these provisions inviting Rim to set its own delivery schedule were printed on the purchase orders.

On March 24, after Rim received the purchase orders, Michaelis and Roshak had another phone conversation. Michaelis acknowledged receipt of the purchase orders but told Roshak that he had not received the deposit. He asked that GE rush the deposit check to Rim and said that the moldmakers would not begin construction until the check arrived. Roshak told Michaelis that Roshak would rush the check through the GE system and that Rim could expect to receive the check at the earliest possible date.

On March 27, 1982, Roshak received a package mailed via Federal Express from W.R. Danien, president of Rim. (Rim 10a). The package included a letter from Danien to Roshak taking exception to certain terms in the purchase orders, and acknowledgements of the purchase orders for the four molds. Rim, as is its usual custom, used its own acknowledgement forms rather than the GE acknowledgement forms included in the GE purchase orders.

All four of the acknowledgements contained the following terms:

> One-third with order; one-third upon notification of mold completion; one-third upon approval of preproduction samples.

The delivery terms for the molds to produce the covers for the right and left hand support arms stated:

> Approximately twenty-two weeks from receipt of one-third deposit. Note: We will accelerate delivery to every possible extent.

For the molds to produce the small desk and keyboard housing, the delivery terms were worded identically to those for the cover molds except that the approximate number of weeks was sixteen and twenty weeks respectively.

Roshak understood that the delivery schedule in the acknowledgements referred to moldmakers' delivery of the molds to Rim rather than Rim's delivery of the parts to GE.[2] He testified that he was not concerned about the delivery terms in the Rim acknowledgements because he thought GE would send the deposit check promptly and because of his discussions with Michaelis.

In his letter objecting to certain of GE's terms, Danien took exception to defendant's requirement that it approve mold drawings and that Rim issue biweekly progress reports. A number of GE personnel including Roshak, met with Jeffrey Hill, Rim's Chicago-based sales agent, on April 2, 1982 to discuss Rim's objections. On April 14, 1982, Roshak wrote to Danien to confirm the agreement reached at the April 2, 1982 meeting. Although the delivery schedule was more important to Roshak than the other objections voiced by Danien in his letter accompanying the Rim acknowledgements, and although it is customary practice in the industry to write a confirming letter if there are variations between the terms in the purchase orders and those in the acknowledgements, Roshak did not include in his letter a confirmation of his understanding of the delivery schedule.

The week of April 26, 1982, Roshak learned for the first time that GE needed the Rim parts delivered to GE by mid-July.

The one-third GE deposit for the molds did not arrive at Rim until April 26, 1982. Roshak understood that the moldmakers would not start construction until receipt of the deposit, although he expected them to begin preliminary design work before receipt of the deposit.

On April 30, 1982, Roshak spoke to Joseph Pompe, the Rim tooling supervisor. Pompe gave Roshak the mold completion dates for the Rim molds. Those dates and the number of weeks they represent from Rim's receipt of the GE deposit check are as follows:

| Molds | Dates Completed | Number of Weeks from April 26, 1982 |
|---|---|---|
| Small desk | 8/30/82 | 18 |
| Keyboard housing | 9/13/82 | 20 |
| Left hand cover arm | 9/20/82 | 21 |
| Right hand cover arm | 10/25/82 | 26 |

(See Rim 13)

Roshak told Pompe that GE needed the parts by mid-July. Michaelis called Roshak and accused GE of unprofessionalism. Although Michaelis was very angry and told Roshak that GE could "take it or leave it," Michaelis agreed to check with the moldmakers about the possibility of improving the delivery dates.

The GE principals held a meeting in early May to discuss the situation. They decided that the dates were unacceptable and that they would visit Rim moldmakers to try to speed up the process. Michaelis refused to allow GE representatives to visit his moldmakers because it was company policy not to permit their customers to speak to moldmakers.

On May 5, 1982, GE representatives visited Polyform, a competitor of Rim whose original quotations GE had rejected because they used an inferior type of mold known as spray metal molds. Polyform suggested that GE use prototype molds to get GE out of its bind. Prototype molds are temporary molds that can produce a limited quantity of parts. Polyform told GE that it could finish prototype molds for General Electric in nine weeks. Roshak told Repinski, the GE project manager for the CT 9800 project, that Roshak thought that prototype tooling was a method of getting the defendant out of a bind. Roshak and Repinski never discussed, however, the possibility of having Rim produce the prototype tooling.

On May 5, 1982, Jeffrey Hill wrote to Rundbaken, Roshak's boss, to confirm that he had spoken to the moldmaker who was to produce the molds for the covers for the left and right hand support arms. The letter (Rim 15) stated that the moldmaker for the cover molds had offered to work overtime and through vacations as necessary to improve the completion date of the

2. The subcontractors who actually construct the molds are the moldmakers. A company such as Rim that produces the parts from the molds is a molder.

molds in exchange for a bonus of $1,000 per week improvement. The letter also stated that the moldmaker for the keyboard housing mold had offered to improve by two weeks the completion time for a bonus. On May 7, 1982, Rundbaken wrote to Danien cancelling the GE order for the four molds. (Rim 17).

On May 10, 1982, when Michaelis received the cancellation letter, he called Roshak. Michaelis suggested that Rim use prototype molds in order to meet GE's schedule. Although Roshak had not sent GE orders to Polyform, he did not accept Michaelis' proposal. The next day, GE sent its purchase orders to Polyform (Rim 21a–d). Although wood patterns and prototype molds were listed on the GE purchase orders for delivery on June 28, 1982 and July 26, 1982 respectively, the permanent molds were to be delivered on October 20, 1982. Thus, Rim's delivery dates for three of the four permanent molds were actually earlier than the date listed on the GE purchase orders to Polyform. The fourth Rim mold was to be completed only five days after the date provided by GE to Polyform.

Polyform did not actually complete the delivery of the four permanent molds until December, 1982.

## II. Count I: Discussion and Conclusions of Law

■ The first question is whether there was an oral contract for delivery of Rim parts to GE on August 20, 1982 or sooner. There is scant evidence to support a conclusion that there was such a contract. The only evidence supporting such a conclusion is Roshak's testimony that he and Michaelis agreed on that delivery date during a March 22, 1982 conversation and the words "8/20/82 or sooner" on the GE purchase orders. Michaelis' testimony and the physical evidence support the conclusion that there was no oral contract for delivery on or before August 20, 1982. Although Michaelis did not recall a specific conversation of March 22, 1982, he stated unequivocally that he never agreed on delivery by August 20, 1982 and that he told Roshak that the clock would not start ticking until Rim received the deposit check.

In light of the physical evidence, the contradictions within Roshak's trial testimony, the contradictions between Roshak's trial testimony and his deposition testimony, and his demeanor on the stand, Roshak's statement that he and Michaelis reached an agreement for delivery of parts on or before August 20, 1982 is simply not credible.

Except for the delivery schedule of "8/20/82 or sooner" on the GE purchase orders, all the physical evidence indicates that there was no oral contract for an August 20 delivery date.

As noted above, Roshak himself had typed on the GE purchase order the term requiring a one-third deposit with the order. Furthermore, the GE purchase orders and acknowledgements invited Rim to furnish the delivery dates if different from those on the purchase orders. Roshak did nothing to obliterate these terms which are found in bold print on the face of the forms. When Rim received the purchase orders, it responded promptly with a letter objecting to certain terms of the purchase orders and Rim acknowledgement forms stating that delivery would occur "approximately twenty-two weeks from receipt of one-third deposit" for the cover mold for the left hand and right hand support arms; "approximately sixteen weeks from receipt of one-third deposit" for the mold to produce the small desk and "approximately twenty weeks from receipt of one-third deposit" for the mold to produce the keyboard housing. Although Roshak sent a confirming letter (Rim 11) in response to the Rim objections to biweekly reports and mold drawings, he never mentioned in his letter that it was his understanding that the parts would be delivered to GE by August 20, 1982 or sooner.

Furthermore, Roshak's testimony at trial concerning the conversation with Michaelis on March 22 was rife with statements that were inconsistent with his deposition testimony.

The following examples demonstrate some of the most egregious inconsistencies between Roshak's trial and deposition testimony:

1. At trial, Roshak testified that during the conversation of March 22 Michaelis told Roshak that normally moldmakers would not begin work before receipt of the deposit, but that Michaelis agreed to get the moldmakers to begin work. At his deposition, however, Roshak testified that Michaelis did not say anything during the March 22 conversation about beginning work. His deposition testimony was that Michaelis said that he would not do anything until he saw the purchase orders. (Roshak deposition at 144, 145).

2. At trial, Roshak testified that he did not believe that Michaelis said that receipt of the check was urgent. During his deposition, however, Roshak testified that Michaelis told him that it was urgent that GE send the deposit check.

3. Roshak also testified at trial that he would have been concerned if he had known that the GE deposit check would take a month to get to Rim. He would not admit, however, that the reason for his concern would be that a delay in getting the check to Rim may have caused a delay in the delivery of the molds. In his deposition, Roshak testified that he would have been concerned because late receipt of the check by Rim might have delayed the program. (Roshak deposition at 166, 167).

4. Although at his deposition Roshak testified that when he wrote to Danien concerning Rim's objections to the GE terms, he should have included a statement that his understanding of the delivery terms agreed upon differed from those in the Rim acknowledgements (Roshak deposition at 169), at trial he refused to admit that he should have included his understanding of the delivery dates in the letter.

5. Roshak testified at trial that Michaelis called him on April 20, 1982 to notify him that Rim had not received the deposit check yet. According to Roshak's trial testimony, Michaelis did not tell Roshak during that conversation that the moldmakers had not begun construction on the molds. His deposition testimony was that Michaelis told Roshak that the moldmakers had not begun construction on the molds. His deposition testimony was that Michaelis told Roshak that the moldmakers had not begun construction. (Roshak deposition at 174).

6. At trial Roshak testified that he did not recall Rundbaken's telling him that Michaelis told Rundbaken that he was going to check with the moldmakers about the possibility of speeding up delivery. During his deposition, Roshak testified that Rundbaken told him that Michaelis was going to check with his moldmakers about overtime in order to speed up the delivery dates and that Michaelis would get back to Rundbaken.

In addition to the inconsistencies between Roshak's trial and deposition testimony, there were internal inconsistencies within Roshak's trial testimony.

The most glaring example of the slippery character of his trial testimony was Roshak's testimony concerning the question whether he told Rim that GE required delivery of parts by mid-July, 1982.

Roshak could not be pinned down as to whether he told Michaelis that GE "required" parts by mid-July or whether he told Michaelis that defendant "would like" parts in mid-July. His testimony varied. At times he said that he told Michaelis that GE "was looking for" parts in mid-July. On other occasions, he testified that "in effect" he said that he had told Pompe that parts were required by mid-July. When faced with a memorandum that he had written to Rundbaken which stated that he had told Rim that the parts were "required" in mid-July (Rim 16), Roshak testified that he thought he said that GE would "like" the parts in mid-July. Later on, Roshak testified that he told Pompe that GE was shooting for whatever parts it could get in July.

The cancellation letter from Rundbaken to Danien (Rim 17) stated: "We regret having to take this action but find it neces-

sary because of your inability to meet the required delivery schedule." Early in his trial testimony, Roshak stated that he understood that Rundbaken was referring to August 20, 1982 as the "required delivery schedule." At his deposition, however, Roshak stated that he understood Rundbaken to be referring to a mid-July requirement for parts. (Roshak deposition at 291).

When confronted with his deposition testimony, Roshak waffled. He admitted that apparently he thought at the time of his deposition that the delivery schedule referred to in Rundbaken's letter was mid-July. He also stated that he did not remember at the time of trial what he thought at the time he saw Rundbaken's letter. He also admitted that his memorandum to Rundbaken (Rim 16) outlining Roshak's discussion with Pompe concerning the delivery dates was most likely to be correct because it was prepared only a few days after the conversation. The memorandum stated that Roshak informed Pompe during the April 30 conversation that parts "were required" at GE in mid-July.

The last but possibly the most convincing example of Roshak's lack of credibility was his explanation for not contacting Rim to reconfirm his understanding that they had an oral agreement for delivery of parts on August 20, 1982 or sooner after receiving Rim's acknowledgement. Roshak testified that he did not contact Rim because the delivery term on the Rim acknowledgement which stated "approximately twenty-two [or sixteen or twenty] weeks from receipt of the one-third deposit" was not necessarily different from the purchase order. There are two plausible explanations for this comment, both of which bring Roshak's testimony into serious question. First, if Roshak was telling the truth that on March 26, the date he received the acknowledgement form, he thought that there was no substantial difference between the August 20, 1982 date on the

purchase order and the Rim acknowledgement term, he must have believed that the GE check would arrive at Rim within days. This belief would contradict his earlier testimony that on March 22 he believed it would take two or three weeks for the checks to arrive at Rim. If, on the other hand, Roshak was telling the truth when he testified that he understood that it would take two or three weeks for the check to arrive at Rim, he must have been lying when he testified that he thought that the delivery term on the acknowledgement form was not necessarily different from the August 20, 1982 date for delivery of parts to GE which he had placed on the purchase order.

Because of the numerous conflicts in Roshak's testimony, Roshak's inaction upon receipt of the Rim acknowledgements containing delivery dates different from the August 20 date, and Michaelis' testimony that he and Roshak never reached an agreement for delivery of parts on August 20, 1982 or sooner, I conclude that there was no oral contract for delivery on August 20 or sooner.

■ Thus, as explained in my opinion of April 26, I must turn to § 2–207 of the Uniform Commercial Code.[3] Section 2–207(1) states:

A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

In my opinion of April 26, I concluded that the writings of the parties did not constitute a contract because the following language in defendant's purchase order fell within the proviso of § 2–207(1):

Acceptance of this order is expressly limited to the conditions of purchase printed on reverse side.

**3.** For a detailed explanation of § 2–207 of the UCC and its application in the present case, *see Reaction Molding Technologies, Inc. t/a*

*Rim/Precision v. General Electric Co.,* 585 F.Supp. 1097 (E.D.Pa.1984).

Having heard the testimony at trial and having researched the issue further I now conclude, however, that this clause does not make acceptance expressly conditional on assent to the additional or different terms as is required in order to fit within the § 2–207(1) proviso.

Generally, the courts have required that the proviso be strictly construed. In *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161 (6th Cir.1972), the court held that the § 2–207 proviso did not apply to a contract term that stated that acceptance was "subject to all of the terms and conditions on the face and reverse side hereof, including arbitration, all of which are accepted by the buyer." The *Dorton* decision, which has been followed almost uniformly *see, e.g., Idaho Power Co. v. Westinghouse Electric Corp.*, 596 F.2d 924 (9th Cir.1979), held that in order to fall within the proviso "it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be *expressly* conditional on the offeror's *assent* to those terms." *Dorton, supra* at 1168 (emphasis in original). The court further concluded that in light of the context of the proviso and the policies behind § 2–207, the proviso would convert an acceptance into a counter-offer only where the offeree clearly reveals its unwillingness to proceed with the transaction unless it is assured of the offeror's assent to the different or additional terms. *Id.* See also *Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.*, 600 F.2d 103 (7th Cir.1979).

In close cases, courts look beyond the words of the clause to the actions of the parties in order to determine whether the proviso applies. In his *Uniform Commercial Code Series*, William Hawkland states that in order to fit within the proviso the qualifying language "must be stated in such a place, manner and language that the offeror will understand in the commercial setting of the transaction that no acceptance has occurred ..." 2 W. Hawkland, *UCC Series* § 2–207:02 at 103.

Hawkland further explains:

[T]he response of the offeree operates as an acceptance if a reasonable man in the position of the offeror would assume that an agreement had been made despite differences in the exchanged forms. In this connection, reasonable belief that the contract has been made must take into account the words that were used by the offeree, where they appeared in his form, whether they were printed, typed or handwritten, along with the total commercial setting of the transaction, including course of dealing and usage of trade. In case of doubt, the court ought to decide in favor of the existence of a contract because chances are good that both parties intended to create one when they exchanged their forms, and, moreover, the ambiguities of the offeree's purported acceptance ought to be resolved against him in close cases ...
*Id.* at 103–104.

The clause in the present case states that acceptance is expressly limited to the conditions printed on the reverse side. Although at first blush the clause appears to fit within the proviso, upon closer examination of the wording of the clause and the commercial context in this case, I conclude that the proviso does not apply. First, the clause states that acceptance is "expressly limited" rather than "expressly conditional." More importantly, the clause states that acceptance is limited to the different terms and conditions on the reverse side, rather than stating that acceptance is conditional on the offeror's "assent" to the different or additonal terms. Furthermore, the clause was preprinted on a form contract, rather than typed or written into the contract. This same clause appeared in the purchase orders for the 1980 contracts between plaintiff and defendant, the subjects of Count II. Thus, plaintiff must have reasonably believed in 1982, that defendant intended to proceed with the transaction in spite of the language in the clause.

Defendant did proceed with the transaction. Upon receipt of the purchase orders, plaintiff promptly sent its acknowledgements and letter of objection to defendant.

Defendant and plaintiff negotiated over mold drawings and biweekly progress reports and defendant sent a letter confirming its understanding of the agreement reached. Nowhere did defendant express to plaintiff that it did not intend to proceed unless plaintiff assented to defendant's terms on the reverse side of the purchase order. At best, therefore, the clause is ambiguous in this context. Since the ambiguity must be resolved against the drafter, the clause does not fit within the proviso.

Because the proviso of § 2–207(1) does not apply, the purchase order was a "seasonable expression of acceptance" under § 2–207(1) and I must apply § 2–207(2) to determine the terms of the contract.

Section 2–207(2) states:

The additional terms are to be construed as proposals for additions to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

As I have explained in my opinion of April 26, there is much controversy among courts and commentators as to whether § 2–207 applies to different as well as to additional terms. *See* at 1104–1105. The delivery term of August 20, 1982 or sooner, inserted by Roshak, is different from the approximate number of weeks quoted in the Rim quotations, especially in light of other terms in the purchase order and the facts as they evolved. The purchase order required a one-third deposit with the order. Michaelis told Roshak that the check was urgent and Roshak agreed to rush the check. The check did not arrive until more than a month after the purchase order was received.[4]

■ I agree with the approach of Summers that § 2–207(2) does not apply to different (as opposed to additional) terms and

that different terms would never become part of the contract. *See* at 1105. Even assuming, however, that § 2–207(2) applies to different as well as to additional terms, Rim's acknowledgement forms notified defendant of Rim's objection to the August 20, 1982 delivery date. Thus, under § 2–207(2)(c), plaintiff's objection to the different term prevents the term from becoming part of the contract. Since GE received the acknowledgements only a few days after Rim received the purchase orders, the notification of objection was given within a reasonable time. Thus, the August 20 delivery term does not become a part of the contract.

Rim's quotations proposed delivery of the four molds to GE in a range of "approximately" sixteen to twenty-two weeks. The quotations also stated that a one-third deposit was due with the order. Consistent with its quotes, Rim's acknowledgement forms stated that the molds would be delivered in a range of "approximately" sixteen to twenty-two weeks from receipt of the one-third deposit from GE. Aware of these proposed terms, GE chose to do business with Rim, never objecting to the Rim dates in the acknowledgement. Therefore, the terms for delivery of the molds to Rim are those appearing in the Rim quotations and acknowledgement forms. Thus, the terms are the following: for the right and left hand covers, approximately twenty-two weeks from the receipt of the deposit; for the small desk and keyboard housing, approximately sixteen and twenty weeks respectively from the receipt of the deposit.

■ The remaining question is whether the Pompe dates complied with the delivery terms of the contract. On April 30, 1982, Joseph Pompe gave GE binding delivery dates. The dates given for the molds to produce the keyboard housing and the left hand cover arms were twenty and twenty-one weeks respectively from April 26, 1982, the date Rim received the GE deposit

---

**4.** Obviously, if GE had tendered its deposit check with the order or immediately upon receipt of the invoice from Rim, it would be a

closer question whether the August 20, 1982 or sooner date was a different term.

check. Because the quotations and acknowledgements for these molds were for approximately twenty and twenty-two weeks, there is no question that these dates comply with the delivery terms of the contract. The only question is whether the delivery dates for the molds to produce the small desk and the right hand cover complied with the delivery terms of the contract.

The Pompe dates for the molds to produce the small desk and the right hand cover were eighteen and twenty-six weeks respectively from receipt of the deposit check. The quotations and acknowledgements for these specific molds were for delivery in "approximately" sixteen and twenty-two weeks respectively.

Witnesses for both sides testified that it is difficult for a molder to predict with precision a mold's completion date. Thus, the witnesses testified, approximations of delivery times are used by molders when quoting terms. Michaelis testified that a variation of twenty percent between the number of weeks quoted and the number of weeks for actual delivery is acceptable within the trade. Michael DiPierro, the president of Polyform, testified that an approximation of twenty-two weeks would "typically" mean that the mold would be completed within twenty to twenty-four weeks.[5]

Jeffrey Hill, whose experience as sales representative to six molding companies puts him in a superior position to that of Michaelis and DiPierro to testify to the industry practice, opined that an estimate of a mold's completion in approximately twenty-two weeks means in the industry that it will be finished between eighteen and twenty-six weeks. In light of his broad experience with many molding companies, I find Hill's testimony credible. Thus, I conclude that delivery within eighteen weeks for the small desk mold[6] and twenty-six weeks for the right hand cover mold from receipt of the deposit check is in compliance with the "approximately" sixteen and twenty-two weeks of the quotations.

The last question on Count I is whether defendant had a right unilaterally to cancel the contract. Because the cancellation terms in the parties' writings conflict with one another,[7] I must resort to other provisions of the UCC to provide the term. Section 2–610 states:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may (a) for a commercially reasonable time await performance by the repudiating party; or (b) resort to any remedy for breach (§ 2–703 or § 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's rights to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 2–704).

Official comment 1 defines anticipatory repudiation as centering "upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Clearly, plaintiff is entitled to damages under § 2–703, which

---

**5.** DiPierro testified that there could be extenuating circumstances that would extend the number of weeks beyond the twenty-fourth week. When faced with a hypothetical giving the situation present in this case, he admitted it might have presented an extenuating circumstance. Thus, his testimony is not inconsistent with that of Michaelis and Hill. Furthermore, DiPierro testified that practices can vary from company to company.

**6.** The testimony of all three witnesses supported the conclusion that a variation of at least two weeks on either side of a quotation was expected within the industry. Therefore, there is no question that the date submitted for the mold to produce the small desk was in compliance with Rim's quotations and acknowledgement forms.

**7.** *See* slip opinion of April 26, 1984.

provides seller's remedies for breach of contract. That section states:

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (§ 2–612), then also with respect to the whole undelivered balance, the aggrieved seller may (e) recover damages for non-acceptance (§ 2–708) or in a proper case the price (§ 2–709) ...

Section 2–708(2) states:

> If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (§ 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

### III.   Count II

■ Count II alleges that defendant owes plaintiff money on two 1980 contracts. The evidence at trial showed that defendant entered into two contracts in 1980, one for plaintiff to have a mold constructed (front cover mold) and another to have an already existing mold converted to the Rim process (end cover mold). After the manufacture and conversion of the two molds, the contracts provided that plaintiff would use the molds to manufacture parts to be sold to defendant.

The molds were constructed/converted to the Rim process and defendant paid plaintiff the contract price. Plaintiff manufactured parts from the molds and sold them to defendant. When the dispute concerning the 1982 contract arose between plaintiff and defendant, defendant demanded delivery of the two molds. Plaintiff delivered the molds to defendant who, in turn, gave the molds to Polyform to manufacture parts for GE from the molds.

The only question is whether defendant owes an additional thirty percent over the contract price because plaintiff has delivered the molds to defendant. Paragraphs 14 and 8 of the reverse side of plaintiff's quotations and acknowledgement forms respectively contained the following printed language:

> In consideration of the fact that the tools and molds described herein are quoted as estimated cost and not at their fair market value, the customer agrees to pay the seller an additional amount equal to thirty percent of the amount originally charged for the tools and molds in the event that delivery thereof is demanded by the customer. The purchaser agrees to accept molds as is.

Printed on the face of defendant's purchase orders appeared the same language as that found on the purchase orders in Count I. Additionally, on the face of defendant's purchase order, the following appeared in typed letters:

> The tooling becomes the property of the General Electric Company and the General Electric Company retains all rights associated with ownership, to include the right to recall the tool.

Printed on the reverse side of the purchase orders were the following paragraphs:

> *Paragraph 1.* Extra charges. No charges of any kind ... will be allowed unless specifically agreed to by buyer in writing. Price is to cover net weight of material unless otherwise agreed. ACCEPTANCE OF THIS ORDER IS EXPRESSLY LIMITED TO THE TERMS AND CONDITIONS CONTAINED HEREIN AND ANY ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS CONTAINED IN SELLER'S RESPONSE HERETO SHALL BE DEEMED OBJECTED TO BY THE BUYER WITHOUT NEED OF FURTHER NOTICE OF OBJECTION AND SHALL BE OF NO EFFECT NOR IN

ANY CIRCUMSTANCES BINDING UPON BUYER ...

*Paragraph 22.* Tooling. All tools, gauges, dies, textures and patterns furnished by the buyer or which the buyer authorizes in writing the seller to acquire for work on this order shall remain the property of the buyer. Such tooling shall be identified and marked as buyer's property and shall be maintained by seller at his expense in suitable operating condition to do the work. Such tooling may be removed from seller's plant at any time by buyer without additional liability to buyer.

Clearly, the parties' terms conflict with one another and the question I must determine is whose terms govern. In order to determine which terms govern, I must first decide whether defendant's purchase orders operate as acceptances of plaintiff's quotations or as counteroffers to plaintiff's quotations.

Plaintiff's quotations constitute the offer because they describe the property to be sold, the price and the delivery terms. Defendant's purchase orders are either written confirmations of an oral agreement between Jim Howard, Roshak's predecessor at GE, and Wilton Danien, or definite and seasonable expressions of acceptance which will operate as acceptances under § 2–207(1) unless the defendant's acceptance "is expressly made conditional on assent to the additional or different terms" in defendant's purchase orders.[8] If defendant's acceptance is expressly made conditional, then the purchase orders operate as counteroffers.

Having heard the testimony of Howard and Danien concerning the origin of the 1980 contracts, and having studied the language in the defendant's purchase orders, I conclude that the purchase orders did not expressly make acceptance conditional on Rim's assent to the different terms. The only provisions in the purchase orders that could conceivably be construed to fall within the proviso to § 2–207(1) are the printed terms on the front of the purchase orders and ¶ 1 on the reverse side.

Because the printed language on the front of the purchase orders is exactly the same as that in Count I, the same analysis applies. The language is printed, not typed or handwritten; it does not expressly make acceptance conditional on Rim's *assent* to the different terms and conditions.

The language in ¶ 1 on the reverse side may be stronger than that placed on the front of the GE purchase orders, but the basic flaw still remains. Paragraph 1 does not require that Rim assent to the different terms before GE will proceed. Thus, at best, there is doubt as to whether the language expressly makes defendant's acceptance conditional on plaintiff's assent to the different terms in the contract. All ambiguities must be construed against the drafter.

Furthermore, the actions of GE by no means communicated to Rim that GE did not intend to proceed with the contract unless Rim assented to GE's terms. Howard testified that he had spoken to Danien and Michaelis about GE's opposition to paying a deposit before GE purchase orders were sent. Both parties agreed that the fifty percent deposit required on Rim's quotations would be reduced to thirty-three percent. He further testified that he called Danien to give him the purchase order number for the newly constructed mold on

---

8. It is not necessary for me to decide whether an oral contract existed as a result of a conversation between Howard and Danien. Legally, it makes no difference whether there was an oral contract between Howard and Danien for the construction and conversion of the respective molds. If there was an oral contract, then defendant's purchase orders are written confirmations. If there was no oral contract, defendant's purchase orders are seasonable expressions of acceptance. In either event, the purchase orders will be treated the same way under § 2–207(1). The situation here differs from that in Count I because in that count defendants were alleging that there was an oral contract that included a delivery term of August 20, 1982. Here, there is not one iota of evidence that anyone at GE discussed the thirty percent surcharge with anyone at Rim. Thus, no claim has been made that there was an oral contract whose term disallowed the thirty percent surcharge.

March 20, 1980. (GE 87). In reliance upon GE's promise to send the deposit check promptly, Danien called Hanson Pattern and Mold Company, the moldmaker, even before GE's purchase order arrived, and asked Hanson to get started immediately on the project. Danien told Hanson that he would forward the GE deposit check as soon as the purchase order and deposit arrived. Hanson agreed to begin work.

The Rim purchase order to Hanson for the newly constructed mold was prepared on March 20, 1980 (GE 72), the same day Howard called GE with the purchase order number and a week before the GE purchase order for the newly constructed mold (Rim 46) was received by Rim.

The purchase order for the reconstruction was prepared by Rim on May 1, 1980 (GE 58), twelve days before Rim received the GE purchase order for the mold (GE 57).

Clearly, Howard's conversations with Rim president Danien and with vice president Michaelis never led Rim to believe that GE would not proceed unless Rim assented to GE's additional terms. In fact, the evidence proves the opposite. Howard led Danien to believe that GE intended to go on with the transaction and then afterwards sent to Rim the GE purchase order containing terms that conflicted with those in the Rim quotations.

If GE desired to assure that no contract existed unless its terms became part of the contract, its legal staff could have drafted language that would have carried out GE's intent. *See* 3 R. Duesenberg & L. King, *Sales and Bulk Transfers under the Uniform Commercial Code*, § 3.06[3] (1982).

## IV. Count III

Danien's uncontradicted trial testimony established that at the time GE demanded delivery of the 1980 molds, the front cover mold had gone through a production run for parts for which GE has never paid Rim. The amount due on these parts is $10,115 (Rim 55).

## V. Damages

Under §§ 2–708 and 2–710 of the UCC, plaintiff is entitled to recover its lost profit and the reasonable expenses and incidental damages it incurred as a result of the breach minus any deposit it had already collected from General Electric. On Count I, I find that the unreimbursed expenses of the breach are reasonable. Thus, plaintiff is due $25,822.

Additionally, under Pennsylvania law, plaintiff is entitled to collect prejudgment interest because defendant committed a breach of a contract to pay a definite sum. Pennsylvania law entitles plaintiff to six percent interest, from the date the final payment would have been due to the date of judgment. *Black Gold Coal Corp. v. Shawville Coal Co.*, 730 F.2d 941 (3d Cir. 1984).

The contracts in Count I provided that final payment was to be made upon approval of the preproduction samples. The uncontradicted trial testimony of Frank Torngren established that the right hand cover mold, the mold with the longest lead time, would have been completed within twenty-two weeks of the date Brockton received the Rim purchase orders on April 28, 1982. Thus, mold construction would have been completed by September 29, 1982.

David Michaelis testified that it would take a maximum of two weeks additional time for Rim's production of sample parts for GE approval. Thus, the sample parts would have been produced by October 13, 1982. There was no testimony concerning how long it would normally take GE to approve preproduction samples. Given GE's urgency to complete the project, it is reasonable to infer that approval would have taken a short time. Counsel shall agree on a reasonable time for approval and submit an appropriate order.

Plaintiff is entitled to $23,040 on Count II, which represents the additional thirty percent surcharge. Rundbaken's testimony at trial established that the two molds in question in Count II were removed from

Rim's premises in October, 1982. The thirty percent charge prescribed by Rim's quotation and acknowledgement forms was payable upon removal of the molds. Therefore, payment of the charge would have been due by November 1, 1982, and Rim is entitled to six percent interest on $23,040 from November 1, 1982 to the date of the judgment.

Rim has established that under Count III it is due $10,115 for parts delivered to GE and invoiced on April 23, 1982. (Rim 55). Because Rundbaken testified that GE's practice was to pay for parts within thirty days of the invoice, payment would have been due by May 23, 1982. Therefore, Rim is entitled to prejudgment interest under Count III on the sum of $10,115 from May 23, 1982 to the date of judgment.

Counsel shall submit an appropriate order.