## The CECO CORPORATION

v.

## CARSON CONCRETE CORPORATION.

### Civ. A. No. 85–1222.

United States District Court,
E.D. Pennsylvania.

Feb. 12, 1988.

As Corrected Feb. 25, 1988.

■■■■■■■■■■■■■■■■

---

Christopher K. Walters, Reed, Smith Shaw and McClay, Philadelphia, Pa., for plaintiff.

Sidney J. Smolinsky, Sidkoff, Pincus & Green, Philadelphia, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

The case at bar is a diversity suit tried to the court. This opinion constitutes the court's findings of fact and conclusions of law.

The controversy arose out of the construction of a large office building in center-city Philadelphia in the early 1980s. The building—One Logan Square—is located just south of the Four Seasons Hotel and about two blocks from the Cathedral of Saints Peter and Paul. The general contractor for this large project was Turner Construction Company ("Turner"). Turner, in the spring of 1981, selected Carson Construction Corporation ("Carson"), a Pennsylvania corporation, as subcontractor for the entire reinforced concrete superstructure—the poured-in-place concrete flooring, vertical columns, and so-called "core area" containing elevator shafts, from the first floor to the top. Carson in turn subcontracted to The Ceco Corporation ("Ceco"), a Delaware corporation headquartered in Illinois, the concrete formwork for all areas of the superstructure other than the "core area." It was contemplated that Ceco would utilize an expeditious and innovative mode of formwork with which it had considerable familiarity: in lieu of the conventional practice, under which separate sets of wooden forms are fabricated and assembled for each floor of a building, Ceco was to employ "flying forms" which are moved by crane from floor to floor as the pouring proceeds.

Ceco began its work in mid-July of 1981 and completed it in mid-October of 1982.

The Carson–Ceco subcontract price was $1,826,000. Certain change orders raised that figure to $1,964,079. Carson has paid Ceco $1,540,744.26, leaving a balance of $423,334.74.

In 1984 Carson advised Ceco that Turner had backcharged Carson $421,587 for the correction of work Turner had determined to have been improperly performed; Carson, in its turn, was holding Ceco accountable for the entire sum. Of these backcharges, $398,046 were said to reflect the cost of correcting the placement, on the perimeters of the poured concrete floors, of upwards of four hundred metal inserts (approximately one-third of the total) on which were hung the granite slabs that formed the outer facings of the building. Ceco denied that it was to blame for the mis-siting of the inserts. Ceco did accept responsibility for $22,000 of other backcharges—the cost of realigning certain vertical columns. Subtracting that $22,000 from the $423,334.74 withheld by Carson from the contract price, Ceco claims—and continues to claim—$401,334.74 to be due and owing as the net unpaid balance for performance of the subcontract.

Also in 1984, Ceco advised Carson that it was claiming $430,277 in delay damages because (1) performance of the subcontract had taken several months longer than Ceco and Carson had anticipated, and (2) (so Ceco asserted) Carson and others—but not Ceco—were responsible for the delays. With respect to these delay claims, Carson's position was and is that (1) Ceco was, and Carson was not, responsible for much of the time lost on the job; (2) quite apart from who was to blame, the aggregate delay was not undue; and (3) in any event, Carson had made no contractual commitment to Ceco to protect it from delay.

With matters at impasse, Ceco in 1985 initiated this suit against Carson. Ceco seeks (1) the unpaid contract balance of $401,334.74 plus prejudgment interest; (2) delay damages (in the Joint Final Pretrial Order Ceco claimed $310,735; in its post-trial submission Ceco seeks $245,000); and (3) attorneys' fees and other litigation-related expenses.

Carson denies that delay damages or attorneys' fees and kindred expenses are ow-

ing. Moreover Carson has filed a counterclaim which, if sustained, would substantially wash out Ceco's claim for the unpaid contract balance. The counterclaim is the $421,587 backcharge claim referred to above. Of that figure, Ceco, as already noted, has acquiesced in $22,000, and Ceco's calculation of the unpaid contract balance as $401,334.74 takes account of that $22,000 credit to Carson. The great bulk of Carson's backcharges are the $398,046 for the allegedly mis-sited metal inserts —a claim Ceco continues to dispute. As for the remaining $1541 in backcharges, Carson has not undertaken to document them in its post-trial proposed findings of fact; therefore, that aspect of the backcharge claims is deemed abandoned. In effect, then, the backcharges counterclaim amounts to $398,046.

The discussion that follows sorts out Ceco's claims and Carson's counterclaim. The starting point is an undisputed indebtedness of $401,334.74 running from Carson to Ceco. The first question to be considered is whether Carson also owes Ceco delay damages—and, if so, the amount of those damages; that question is addressed in Part I of this opinion. Part II addresses the question whether Ceco is liable to Carson for backcharges—and, if so, in what amount. Part III considers questions relating to interest and also to attorneys' fees and kindred expenses.

## I.

### The Ceco Claim For Delay Damages

A. *Does the Carson–Ceco Subcontract Protect Ceco Against Delays?*

Ceco's delay claims center on the discrepancy between, on the one hand, the performance timetable Carson and Ceco allegedly agreed upon and, on the other hand, the actual timetable. According to Ceco, the parties to the subcontract contemplated that Ceco's work would get under way on June 1, 1981, and would be completed in February of 1982, whereas in fact Ceco did not get the green light until the middle of July, 1981, and did not finish until the middle of October, 1982. Ceco contends that these delays (a) were not of its own making and (b) increased its performance costs substantially. Ceco seeks to recover pursuant to Condition 2, the second of twenty-six pre-printed "Conditions" which comprise the last two pages of a seven-page Ceco document entitled "Proposal and Contract," also known as "Form 110E." The first five pages of Form 110E are typed, not pre-printed, and cover in some detail a number of matters having particular reference to Ceco's role in the One Logan Square project.[1] The caption headings are "SCOPE," "EXCLUSIONS," "SPECIFIC PROVISIONS," "PLAN REFERENCE," "OSHA," "PRICE," AND "TERMS." Two of these particularized provisions (paragraph 6 of SCOPE and paragraph 14 of SPECIFIC PROVISIONS) expressly supersede two of the pre-printed Conditions. Condition 2—the pre-printed Condition relied on by Ceco—is captioned "Delay." It reads as follows:

Ceco will not be responsible for delays in performance caused by delays due to strikes, jurisdictional disputes, disputes between union and non-union personnel, shortages of materials and equipment, fires, acts of nature, wars, or other circumstances reasonably beyond Ceco's control. In the event of delays beyond Ceco's reasonable control, the time set for performance shall be extended for a period equivalent to the period of delay, and Ceco shall not be liable for damages for such delay. In the event of substantial delay in the progress of the work, for which Ceco is not responsible, Ceco shall have the right to remove its equipment upon two weeks' notice. If, as a result of circumstances beyond its reasonable

1. Form 110E, dated as of October 14, 1981, and sent to Carson on November 10, 1981, is annexed to this opinion as Appendix A. It differs from Form 110E, dated as of April 30, 1981, and sent to Carson on that day, in stating the price as $1,826,000 rather than $1,775,000. The $51,000 increment was occasioned by the fact that Ceco, rather than the owner of One Logan Square, was to pay for workmen's compensation insurance and liability insurance. See paragraph following paragraph 8 of June 8, 1981, letter from Carson to Ceco, *infra*, note 2. The parties are not in disagreement on this.

control, Ceco is delayed in, or prevented from, performance of this contract until a date substantially beyond the date contemplated for performance, and thereby incurs expense or suffers loss or damage, there shall be a reasonable increase in the contract price.

Carson denies responsibility for the delays, lays some of the blame at Ceco's door, and challenges Ceco's calculation of consequential damages. Also, Carson denies that there was agreement on a June–1981–to–February–1982 timetable. But Carson further contends that Ceco's delay claim founders at the outset for the reason that nothing in the Carson–Ceco subcontract undertook to assure Ceco that costs incurred as the result of delays for which Ceco was not responsible would be borne by Carson. Specifically, Carson contends that neither Condition 2, nor any other part of Form 110E, is part of the Carson–Ceco subcontract. To that threshold question we now turn.

(1) *Is Form 110E Part Of The Carson–Ceco Subcontract?*

In Carson's view, the written contract between it and Ceco consists of a two-page letter of intent sent by Carson to Ceco on June 8, 1981,[2] supplemented by a somewhat briefer Carson-to-Ceco letter of September 14, 1981.[3] These letters deal with

**2.**

June 8, 1981

Mr. A.P. Cupo
The Ceco Corporation
715 Twining Road—Suite 112
Dresher, PA 19025

Re: One Logan Square Office Building

Gentlemen:

It is the intent of Carson Concrete Corporation to enter into a contract with you for concrete formwork on the above referenced project. A formal contract will be issued upon receipt of our subcontract from Turner Construction Company.
The scope of work by Ceco is to include the following:
1. The forming of all concrete slabs, beams, and columns outside the core area, including all slab edge bulkheads, bulkheads at architectural openings in slabs, bulkheads, top of slab depression bulkheads, including furnishing and placing all chamfer.
2. Install temporary guardrails on the form decks at the building perimeter and large openings. These guardrails will be removed when the forms are stripped.
3. Reshoring for three typical levels.
4. Provide sufficient material as required to form two maximum levels at one time, and $2\frac{1}{3}$ floors of domes.
5. Install built-in miscellaneous items shown on contract drawings.
6. Orderly cleanup and disposal of debris into dumpsters provided by Turner Construction Company.
7. This contract is based on Ceco using a "flying" system; and the provision that pouring of concrete is to take place on a four (4) working day schedule for typical tower floor after flying system is operational (four (4) pours per typical floor). This contract is limited to forming structural elements shown on structural drawings ST 1 thru ST 12 dated 3/23/81 issued by Kohn, Pedersen, Fox Associates.
8. Ceco employees and sub-subcontractors, will perform the contractual obligations in compliance with applicable regulations issued pursuant to the Construction Safety Act of 1969 and the Occupational Safety and Health Act of 1970, and revisions to same acts.
The agreed to firm lump sum price for the work required is $1,775,000.00. This sum is based on the owner providing wrap-up insurance to cover all worker's compensation and general liability requirements. Should the owner elect not to provide the wrap-up insurance, this contract price would increase by $51,000.00.
The following unit prices will be used for embedded items not shown on the contract drawings:

| | |
|---|---|
| Dovetail Slot | $0.40/CF |
| Wedge Inserts | $2.15/EA |
| Precast Anchors | $3.00/EA |

Carson Concrete Corporation agrees to pay Ceco by the 25th of the month following completion of work, with billings to be based on the $/SF price determined by dividing the contract cost by 600,000 SF of horizontal surface area. Retainage in the amount of ten (10%) percent will be withheld on the first half of the contract, and no additional retainage will be taken on the remaining work.

Respectfully yours,

CARSON CONCRETE CORPORATION

Howard R. Cohen, P.E.

**3.**

September 14, 1981

Mr. A.P. Cupo
The Ceco Corporation
715 Twining Road—Suite 112
Dresher, PA 19025

RE: One Logan Square Office Building

some of the topics addressed in Form 110E, plus certain others such as the minimum liability insurance coverage Ceco was to obtain.

Ceco contends that the Carson letters of June 8, 1981, and September 14, 1981, are only half of the contract equation. The other half of the written contract, according to Ceco, is Form 110E, copies of which were sent by Ceco to Carson on April 30, 1981, five-and-a-half weeks before Carson sent Ceco its June 8, 1981 letter of intent. Ceco emphasizes that (1) in a June 30, 1981 letter of assent to Carson's letter of intent Ceco noted that acceptance was "subject to all provisions of our Proposal and Standard Contract Agreement," and (2) in November of 1981, when acknowledging and agreeing to Carson's September 14, 1981 letter, Ceco expressly keyed acceptance to its "attached ... Proposal & Contract 1–35–15002 Rev. October 14, 1981" and "to attached letter" which in turn stated that "we are accepting your letter/Order form subject to all provisions of our Proposal & Contract (Form 110E) revised...."

Carson responds that Ceco's attempts to trammel its acceptance of Carson's letter proposals with references to Form 110E must be deemed to have no legal effect.

To assess these competing contentions, it will be necessary to consider the various exchanges between Carson and Ceco from April through November in some detail. The following facts have been stipulated:

6. In 1980 or early 1981, Turner Construction Company (hereinafter "Turner") was acting as the general contractor in the construction of a high-rise office building at One Logan Square, 18th Street and Logan Circle, Philadelphia, Pennsylvania. The construction of this office building is hereafter referred to as "the Project."

7. The governing plans and specifications for the Project required its superstructure to be constructed of reinforced poured-in-place concrete, consisting of vertical columns, a concrete "core area" housing the elevator shafts, and 33 stories of concrete flooring.

8. On or about April 6, 1981, Turner received bids from potential subcontractors, including defendant Carson, to provide to Turner the concrete superstructure for the Project.

9. On or about April 3, 1981, and preliminary to Carson's bid submission to Turner, Ceco sent a six-page form enti-

---

Ceco Contract 1–35–15002

Gentlemen:

This letter is to serve as a Contract between The Ceco Corporation and Carson Concrete Corporation for the scope of work as listed in our June 8, 1981, letter of intent.

The firm lump sum price of this Contract is $1,826,000.00 and includes all Worker's Compensation Insurance, and General Liability Insurance requirements as listed below:

1. Contractors' Public Liability Insurance including Contractual Liability Insurance against the liability assumed hereinabove, and including Contractors' Protective Liability Insurance if the Subcontractor sublets to another all or any portion of the Work, with the following minimum limits:

Bodily Injury, including

| death: | $5,000,000 per accident |
| Property Damage: | $5,000,000 per accident |
| | $5,000,000 aggregate per policy year |

2. Automobile Liability Insurance covering all owned, non-owned and hired automobiles used in connection with the Work, with the following minimum limits:

Bodily Injury, including

| death: | $5,000,000 per person |
| | $5,000,000 per accident |
| Property Damage: | $5,000,000 per accident |

Billings for completed work will be determined by the sum of the horizontal surface area completed multiplied by $3.10/SF ($1,826,000/588,-000SF).

All other terms and conditions of our June 8, 1981, letter of intent remain unchanged.

Respectfully yours,

CARSON CONCRETE CORPORATION

Howard R. Cohen

THE CECO CORPORATION

(SIGN) _____

(TITLE) _____

(DATE) _____

tled "Proposal and Contract" to Carson offering to perform certain of the concrete forming work on the Project's superstructure. This "Proposal and Contract" did not contain a price for the job.

10. On or about April 21, 1981, Turner awarded the superstructure concrete contract to Carson. Turner further stated that a formal contract would be prepared at a later date. Carson so notified Ceco and Carson and Ceco thereupon began to negotiate terms under which Ceco would provide to Carson the concrete superstructure formwork on all areas outside the "core area."

11. On or about April 29, 1981, Carson and Ceco agreed to the general scope of the work and set an initial price of $1,775,000.00 as the contract price. This verbal agreement assumed the building's owner, and not Ceco, would provide certain insurance which otherwise would have to be provided by Ceco at an additional cost of $51,000.00.

12. On April 30, 1981, Ceco sent three copies of its revised Proposal and Contract (including Ceco's standard detailed contract conditions) to Carson. Ceco's transmittal letter enclosing this Proposal and Contract stated "If you [Carson] prefer, you may use the enclosed form as a guide in preparing your purchase order."

13. On June 8, 1981, Carson sent a "letter of intent" to enter into a subcontract with Ceco. The letter briefly outlined the scope of Ceco's work, restated the agreed price of $1,775,000 (plus an extra $51,000 if Ceco was to provide the necessary insurance), and stated that a formal contract would be issued upon receipt of Carson's subcontract from Turner Construction Company.

14. By a letter dated June 30, 1981, Ceco stated that Ceco accepted Carson's June 8, 1981 letter of intent. The letter further stated that Ceco's acceptance was "subject to all provisions of our Proposal and Standard Contract Agreement." The letter was signed for Ceco by an officer in Ceco's Illinois home office.

15. In or about August 1981, Turner issued its formal contract to Carson.

16. On September 14, 1981, after receiving its written subcontract from Turner, Carson sent to Ceco a brief letter which it stated "is to serve as a Contract between The Ceco Corporation and Carson Concrete Corporation for the scope of work as listed in our June 8, 1981 letter of intent." The letter stated a final lump sum price of $1,826,000 (which included the requirement that Ceco provide the extra insurance). The last sentence of the letter read "All other terms and conditions of our June 8, 1981, letter of intent remain unchanged."

17. The September 14, 1981 letter was signed by Howard Cohen, Vice President of Carson. At the bottom left of the letter was a line calling for Ceco's signature. Mr. Cohen's letter requested that Ceco indicate its acceptance by signature thereon and return to Carson.

18. On November 10, 1981, Ceco returned to Carson a signed copy of the September 14, 1981 "letter contract" to Carson together with a copy of its revised Proposal and Contract dated October 14, 1981. The Ceco signature was that of a Ceco Vice President in Ceco's home office in Illinois. Typed over the signature line for Ceco were the added Ceco words "All in accordance with attached Ceco's Proposal & Contract 1–35–15002 Rev. October 14, 1981." Also typed over the Ceco signature line were the added Ceco words "Accepted subject to attached letter."

19. Ceco's cover letter accompanying the signed "letter contract" stated "Please note we are accepting your letter/Order subject to all provisions of our Proposal and Contract (Form 110E) revised in addition to M.E. Kersten's letter of June 30, 1981 acknowledging your letter of intent."

20. Carson never raised any written objection, or took written exception, to Ceco's letter of November 10, 1981.

Carson contends that Ceco's attempts, in its communications to Carson of June 30, 1981, and November 10, 1981, to key acceptance of the subcontract to its Form 110E are a legal nullity and should there-

fore be disregarded. In advancing this contention, Carson places strong reliance on *Reaction Molding Technologies v. General Electric Co.*, 588 F.Supp. 1280 (E.D. Pa.1984), a diversity case which, like the case at bar, arose under Pennsylvania law. The issue which there confronted my colleague, Judge Lord, was whether the recital on the buyer's purchase order that "Acceptance of this order is expressly limited to the conditions of purchase printed on reverse side" was effective to incorporate the buyer's form conditions into the bargain. The issue, Judge Lord determined, was governed by Section 2–207 of the Uniform Commercial Code, which is part of the statute law of Pennsylvania (12A P.S. § 2–207):

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Judge Lord concluded, on the facts before him, that the buyer's statement of acceptance was not one in which, within the intendment of section 2–207(1), "acceptance [was] expressly made conditional on assent to the additional or different terms," and hence it "operate[d] as an acceptance." Judge Lord's reasoning was as follows (588 F.Supp. at 1288):

The clause in the present case states that acceptance is expressly limited to the conditions printed on the reverse side. Although at first blush the clause appears to fit within the proviso, upon closer examination of the wording of the clause and the commercial context in this case, I conclude that the proviso does not apply. First, the clause states that acceptance is "expressly limited" rather than "expressly conditional." More importantly, the clause states that acceptance is limited to the different terms and conditions on the reverse side, rather than stating that acceptance is conditional on the offeror's "assent" to the different or additional terms. Furthermore, the clause was preprinted on a form contract, rather than typed or written into the contract. This same clause appeared in the purchase orders for the 1980 contracts between plaintiff and defendant, the subjects of Count II. Thus, plaintiff must have reasonably believed in 1982, that defendant intended to proceed with the transaction in spite of the language in the clause.

Assuming *arguendo* that the UCC were applicable to the case at bar, the differences between the facts of *Reaction Molding* and the facts of this case outweigh the similarities. In this case Ceco's iterated references to its Form 110E were not "preprinted on a form contract": three of them were embodied in letters, and two more were typed above the signature of the corporate official who signed for Ceco on the signature line provided by Carson in its September 14, 1981 letter to Ceco. Furthermore, these several references were all incident to the negotiation of a single large-scale agreement. The record is barren of any antecedent Carson–Ceco agreements with respect to which Ceco ritually mentioned Form 110E in a manner not intended to be taken seriously; that is to say, there

was no prior Carson–Ceco history which would support an inference, analogous to that drawn by Judge Lord in *Reaction Molding*, that "[defendant] must have reasonably believed, in [1981], that [plaintiff] intended to proceed with the transaction in spite of the language in the clause."

■ The foregoing paragraphs have taken as their premise that the dispute between Ceco and Carson is governed by the UCC. But it is not. As Carson acknowledges, the Carson–Ceco contract, whatever documents and conversations it may consist of, is not a sales contract. Carson contends, however, that "Pennsylvania case law suggests that the Uniform Commercial Code can be looked to for contract interpretation notwithstanding that the contract at issue is not one of a sale of goods." *Reply Memorandum of Carson Concrete to the Requests for Findings of Fact and Conclusions of Law of The Ceco Corporation* 2. If the meaning of this submission is that Pennsylvania courts would import into the adjudication of non-sales-contract disputes the special rules prescribed by UCC section 2–207 relating to acceptances linked to the specification of additional terms, the cases relied on by Carson lend scant support for the proposition contended for.

In *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968), the Pennsylvania Supreme Court had before it a dispute arising under a construction contract; in *rejecting* the contention "that the chancellor erred in not enforcing the contract provision that extra would not be paid for unless done pursuant to a written, signed change order," the court said, "[u]nless a contract is for the sale of goods, see the Uniform Commercial Code–Sales, the Act of April 6, 1953, P.L. 3 § 2–209(3), as amended, 12A P.S. § 2–209(2), it appears undisputed that the contract can be modified orally although it provides that it can be modified only in writing." 244 A.2d at 15. In *Magar v. Lifetime*, 187 Pa.Super. 143, 144 A.2d 747, 748 (1958), the Superior Court cited the Restatement of Contracts and Corpus Juris Secundum as authority for its holding that

a limitation of liability clause in a construction contract "was valid and enforceable," and then referred to a cognate provision of the UCC "[b]y way of analogy." *Bethlehem Steel v. Litton Industries*, 321 Pa.Super. 357, 468 A.2d 748 (1983), is, according to Carson, a case in which "the Superior Court resorted to the Uniform Commercial Code to supply missing terms in the parties' contract *without* ruling whether or not the contract at issue was a contract for the sale of goods." *Reply Memorandum of Carson Concrete*, quoted *supra*, at 2. But examination of Judge Wickersham's opinion in *Bethlehem Steel* does not confirm that reading of the case. The case was one in which Bethlehem Steel sued Litton Industries for the latter's failure to honor what Bethlehem Steel regarded as an irrevocable five-year option to order from one to five large ore-carrying vessels. What Bethlehem Steel viewed as a contract—an exchange of letters between the parties—was viewed by Litton Industries as so imprecise with respect to terms of crucial importance as, in the words of the trial court, not to "constitute a contract, but at most ... an agreement to agree." 468 A.2d at 751. The trial court noted that, "[o]ne of the contentions of Bethlehem is that these agreements come within the Uniform Commercial Code and, therefore, gaps (if any appear in the documents), may be filled in by the Court.... Even if the Uniform Commercial Code is applicable, the Court must first find that there was intent to enter into a contract by the two letters.... Because of the nature of the gaps as has been discussed in this Opinion, it would appear that only the parties are the exclusive entities capable of filing in the gaps. Because these gaps are so wide, the Court cannot make a new contract for the parties." *Id.*, 468 A.2d at 756–8. The Superior Court, sitting *en banc*, affirmed. Speaking through Judge Wickersham, the majority held

In summary, we agree with the finding of the lower court that there was no enforceable contract between the parties. It is true, of course, that under the UCC a court may be able to supply missing terms in a contract. Under section 2–

204(3) of the UCC, however, a court should only perform this "gap-filling" duty if it determines the parties did in fact intend to make a contract. Here, the lower court found that the absence of the terms necessary to calculate the escalation in price to be allowed for inflation and to apportion that escalation over time pointed not to the mere omission of a few terms in an otherwise complete contract, but instead to the absence of an intent to contract between the parties. A determination as to the intent of parties presents a question of fact that may not be reversed on appeal in the absence of an abuse of discretion. We find no such abuse of discretion here, therefore, we affirm the order of the lower court.

*Id.*, 468 A.2d at 758. In short, *Bethlehem Steel v. Litton Industries* is *not* a case in which the court *applied* provisions of the UCC without first determining that the transaction at issue was a sales transaction. Rather, it is a case in which the court found it unnecessary to characterize the transaction as a sales transaction or not because, assuming *arguendo* the applicability of the UCC, the Code's generous "gap-filling" provisions nonetheless would not have sufficed to create a contract out of a sow's ear.

█ Recognizing the possibility that this court may be "uncomfortable in applying the Uniform Commercial Code, Carson respectfully suggests that Section 2–207 of the Code is the mirror image of §§ 59 and 61 of the Restatement (Second) of Contracts." *Reply Memorandum of Carson Concrete*, quoted *supra*, at 3. Application of sections 59 and 61 would, so it is contended, thus lead to the result arrived at in *Reaction Molding*.

The difficulties with this contention are two-fold. The first is that, if one assumes that the Code section and the Restatement sections are "mirror images," *Reaction Molding* would not govern this case because, as explained above, they are factually dissimilar. The second difficulty is that the UCC and Restatement provisions are similar but not identical; and the lack of identity relates to one of the elements fig-

uring strongly in Judge Lord's analysis in *Reaction Molding*. Thus, section 2–207(1) specifies that:

A definite and seasonable expression of acceptance ... operates as an acceptance even though it states terms additional to or different from those offered ... *unless acceptance is expressly made conditional on assent to the additional or different terms.* (emphasis added)

Section 61 of the Restatement (Second) provides:

An acceptance which requests a change or addition to the terms of the offer is not thereby invalidated *unless the acceptance is made to depend on an assent to the changed or added terms.* (emphasis added)

And section 59, the obverse of section 61, provides:

A reply to an offer which purports to accept it *but is conditional on the offeror's assent to terms additional to or different from those offered* is not an acceptance but is a counter-offer. (emphasis added)

Significantly lacking from the Restatement formulations is the UCC specification that a reply purporting to agree to an offer but stating additional or different terms is treated as an acceptance unless the offeree's acceptance is "*expressly* made conditional on [the offeror's] assent" (emphasis added) to the new terms. And this aspect of section 2–207(1) was of crucial importance in *Reaction Molding*, 588 F.Supp. at 1288: "The clause in the present case states that acceptance is expressly limited to the conditions printed on the reverse side. Although, at first blush, the clause appears to fit within the proviso, upon closer examination of the wording of the clause and the commercial context in this case, I conclude that the proviso does not apply. First, the clause states that acceptance is 'expressly limited' rather than 'expressly conditional.' More importantly, the clause states that acceptance is limited to the different terms and conditions on the reverse side, rather than stating that acceptance is conditional on the offeror's 'assent' to the different or additional terms."

What the UCC and Restatement provisions have in common is that both are concerned with how to handle the injection into an about-to-be-consummated bargain of "terms additional to or different from those offered." In the case at bar, the document variously entitled "Proposal and Contract" and "Form 110E" was the *first* written document placed on the table by either of the parties—sent by Ceco to Carson on April 30, 1981, the day after the parties reached an oral understanding in which they "agreed to the general scope of the work and set an initial price of $1,775,-000.00 as the contract price" [Stipulated Fact 11]. Ceco sent the same document again on June 30, 1981, in responding affirmatively to Carson's June 8, 1981, letter of intent. And so, when Ceco in November sent its up-dated Form 110E to Carson as part of its acceptance of Carson's letter of September 14, 1981, Carson had seen the document twice before.[4]

Indeed, Carson had not only seen the document before, Carson had built on it in drafting its June 8, 1981, letter of intent. The first sentence of paragraph 7 of the letter of intent[5] draws on the first sentence of the second subparagraph of Form 110E's paragraph 14[6] and on Form 110E's paragraph 20.[7] The second sentence of paragraph 7 of the letter of intent[8] derives from the "PLAN REFERENCE" portion of Form 110E.[9] And paragraph 8 of the letter of intent[10] substantially tracks the first sentence of Form 110E's "OSHA" provision.[11]

In short, Form 110E was an integral part of the two months of written interchange running from Ceco's letter to Carson of April 30, 1981 to Ceco's June 30, 1981 letter accepting Carson's letter of intent—two months which preceded Ceco's actually starting to work under the subcontract. Furthermore, in November of 1981, over three months after Ceco had commenced performance, Ceco, in transmitting its signed acceptance of Carson's letter of September 14, 1981, sent Carson an updated version of Form 110E, reiterating over the Ceco signature "[a]ll in accordance with attached Ceco's Proposal & Contract ..." In this context, the contention that Carson, at any time after it sent Ceco its letter of intent on June 8, 1981, could reasonably have regarded Form 110E as "terms additional to or different from those offered," is not persuasive. If Carson entertained reservations about particular provisions of Form 110E, the prudent and legally effective course for Carson to pursue would have been to bring those disagreements to Ceco's attention.[12] *Cf.* Restatement (Second) of Contracts, § 69(1)(c).

4. Actually, Ceco had sent Carson an earlier version of Form 110E back on April 3, 1981, over two weeks before Carson received the Turner subcontract and over three weeks before Ceco and Carson reached an oral understanding on the scope and price of Ceco's undertakings; the April 3 Form 110E did not propose a price.

5. "The contract is based on Ceco using a 'flying' system; and the provision that pouring of concrete is to take place on a four (4) working day schedule for typical tower floor after flying system is operational (four (4) pours per typical floor)."

6. "This contract is based on Ceco using a 'flying' system."

7. "This contract is based upon the provision that pouring of concrete is to take place on a four (4) working day schedule for typical tower floor after flying system is fully operational (four (4) pours per typical floor)."

8. "This contract is limited to forming structural elements shown on structural drawings ST 1 thru ST 12 dated 3/23/81 issued by Kohn, Pedersen, Fox Associates."

9. "The contract is based upon structural drawings nos. ST–1 thru ST–12, dated 3/23/81, with no specifications or addenda, as issued by Kohn, Pedersen, Fox Associates, subject to all clarifications stated hereinabove."

10. "Ceco employees and sub-subcontractors, will perform the contractual undertakings in compliance with applicable regulations issued persuant [*sic*] to the Construction Safety Act of 1969 and the Occupational Safety Act of 1970, and revisions to same acts."

11. "Ceco agrees that it, its agents, employees and sub-subcontractors, will perform the contractual obligations of Ceco in compliance with applicable regulations issued pursuant to the Construction Safety Act of 1969 and the Occupational Safety Act of 1970.

12. That was in fact the course pursued by Carson the following spring in connection with a

I conclude, therefore, that Form 110E in its entirety is part of the Carson–Ceco One Logan Square subcontract.

### (2) *Does Condition 2 Of Form 110E Support Ceco's Delay Claim?*

The foregoing discussion has established that Form 110E is part of the Carson–Ceco subcontract. The next question is whether Condition 2, on which Ceco relies in pressing its delay claim, frames a cognizable cause of action.

#### (a) *What Does Condition 2 Provide?*

 Since the parties are in disagreement as to the legal effect of Condition 2, it will be helpful to set it forth again in full text:

> Ceco will not be responsible for delays in performance caused by delays due to strikes, jurisdictional disputes, disputes between union and non-union personnel, shortages of material and equipment, fires, acts of nature, wars, or other circumstances reasonably beyond Ceco's control. In the event of delays beyond Ceco's reasonable control, the time set for performance shall be extended for a period equal to the period of delay, and Ceco shall not be liable for damages for such delay. In the event of substantial delay in the progress of the work, for which Ceco is not responsible, Ceco shall have the right to remove its equipment upon two weeks' notice. If, as a result of circumstances beyond its reasonable control, Ceco is delayed in, or prevented from, performance of this contract until a date substantially beyond the date contemplated for performance, and thereby incurs expense or suffers loss or damage, there shall be a reasonable increase in the contract price.

Ceco contends that it undertook the subcontract on the understanding that its work would be completed by approximately February 15, 1982; that in fact completion of its work took until the middle of October; that the delays were not of Ceco's own doing; that the delays required Ceco to incur additional and unanticipated costs for labor, material and the use of equipment; and hence that it is entitled, under the last sentence of Condition 20, to "a reasonable increase in the contract price."

Carson argues for a different reading of Condition 20. Carson says that "[e]xclusive of the last sentence ... the balance of this provision is ... what is commonly known as a 'no damage' clause.... [W]hen a contractor has a 'no damages' clause in its contract together with provisions that the contractor shall be entitled to an extension of time to perform, it has been held that the extension of time for performance is the sole remedy that the contractor may pursue." *Carson Concrete's Proposed Findings of Fact, Conclusions of Law and Points of Authorities in Support Thereof* 69–70.

The cases cited as so holding are *Siefford v. Housing Authority*, 192 Neb. 643, 223 N.W.2d 816 (1974), and *Ericksen v. Edmonds School District*, 13 Wash.2d 398, 125 P.2d 275 (1942). These decisions of the Supreme Courts of Nebraska and Washington stand for the proposition that a provision in a construction contract exempting the owner from liability to the contractor for delay damages will be enforced even where the owner is responsible for the delay. The tenor of the decisions is reflected in the *Siefford* court's summary of *Ericksen*, whose reasoning it found persuasive: "... [T]he court held that where the con-

Ceco subcontract on the construction of B'nai Brith West in Allentown, Pennsylvania. On April 13, 1982, Ceco wrote Carson:
> We are returning one approved machine copy of your Letter Order dated March 15, 1982. As on previous agreements, we are accepting this Letter Order subject to all provisions of our Proposal and Contract (Form 110E) dated October 29, 1981 and have so indicated at Page 2. In addition we have deleted your "Owner Payment" provision as our standard terms of payment shall apply.

On April 14, 1982, Carson responded:
> The only agreement acceptable to Carson Concrete Corporation on the above referenced project is that listed in our letter of March 15, 1982. The acceptions [*sic*] and deletions listed in your letter forwarded April 13, 1982, are not acceptable.
> At this point of the project, it appears that we have agreed to disagree on the contract language.

tract stated positively that the building contractor should not be entitled to damages on account of delays from any cause and stated that, if delays were occasioned by any act or omission of the owner, additional time for completion of the work should be allowed contractor, if contractor should give written notice, contractor was not entitled to recover from owner for damages sustained because owner allegedly retarded the progress and performance of the work in its proper order and sequence, irrespective of any notice to owner for an extension of time, and further that the provision intended that an extension of time was the contractor's sole remedy for delays encountered in the performance of the contract." *Siefford*, 223 N.W.2d at 823. It is not readily apparent in what way decisions enforcing contract provisions that expressly preclude the recovery of delay damages militate against enforcement of a contract provision expressly providing for delay damages.[13]

### (3) *Was There An Agreed Timetable For The Carson–Ceco Subcontract?*

■ As of June 10, 1981, Turner and Carson had reduced to writing certain understandings which, some weeks later, were embodied in the formal Turner–Carson subcontract. One of these understandings, which authoritatively confirmed both the mode of construction of the superstructure and the time the job was expected to take, was as follows:

> Time is of the essence and lump sum price includes a four (4) day cycle for typical decks with approximately ± 190 working days total.

The Turner–Carson understanding validated the provisional Carson–Ceco arrangements which, as of April 29, had contemplated a four-day pouring cycle. The Turner–Carson expectation that Carson would finish the superstructure in ± 190 working days meant to Anthony J. Samango, Carson's president, and Benjamin Botti, Ceco's district manager, that Ceco would be at the job site about ten days fewer than Carson. Initially, it was anticipated that Ceco's portion of the job would get under way by June 1, with a target completion date of mid-February 1982. Problems with the foundation prevented Ceco from starting until mid-July. Although the foundation problems were in no sense Ceco's fault (indeed, the foundation was also a Carson responsibility, under another Turner–Carson subcontract), Ceco was aware of and may be taken to have acquiesced in the later starting date—a change which in turn implied a later completion date, namely, April 1, 1982. In fact, Ceco's work was not done until mid-October of 1982, approximately six-and-a-half months beyond the revised target date.

### (4) *Were The Delays Compensable Under Condition 20?*

■ Condition 20 of Form 110E provides for a "reasonable increase in [Ceco's] contract price" to cover expenses incurred in consequence of delays "beyond its reasonable control." The six-and-half months' delay at issue here stemmed from manifold causes. The most prominent cause, and the one to which most testimony was directed, was the Carson decision, when construction of the superstructure reached the

---

**13.** The only Pennsylvania case cited by Carson, *Acchione v. Commonwealth,* 347 Pa. 562, 32 A.2d 764 (1943), is, if anything, less apposite than *Siefford* and *Ericksen. Acchione* was a claim for delay damages arising out of a highway construction contract. The modest arbitration award in the contractor's favor was reduced by the Commonwealth Court. The Pennsylvania Supreme court affirmed: "The court below ... concluded that the contractor covenanted to make no claim for damages for delay in the performance of his contract, when such delay was occasioned by the failure of utilities or others to remove structures from the site.... The only reasonable interpretation of the language of the contracts is that the Commonwealth agreed to deliver the site burdened with existing obstructions over which it exercised no direct control. From previous experience the contractor had reason to know that some delay would ensue, and the cost of such reasonable delay was a proper element of expense to be estimated and included in the bid.... The appellant's remedy was to treat the failure to clear the site as a temporary impossibility and to refuse to perform.... By continuing the work the appellant assumed the risk of delay and cannot now be heard to complain." 32 A.2d at 765–66.

ninth floor, to forego the four-day per-floor pouring cycle in favor of a five-day cycle. Carson adduced many good reasons for the decision—most especially, the bitter cold of the 1981–82 winter which, in addition to slowing Carson's core area work, severely aggravated problems of safety and morale. However, none of these was a problem for which Ceco had responsibility. Nor was Ceco responsible for other problems which delayed completion of Ceco's phase of the work: difficulties with the foundation which, at the very inception of Ceco's work, impeded real progress until well into August of 1981; the sporadic unavailability of the cranes which were critical to Ceco's flying-form process; lack of materials, or of needed assembly spaces; design changes; reversal by Carson of the agreed direction of pouring (east-to-west, rather than west-to-east), etc. In sum, the problems which slowed Ceco by upwards of six months were "beyond its reasonable control."

> (5) *Given The Additional Expenses Incurred By Ceco Because Of The Delays, What Is A "Reasonable Increase In The Contract Price?"*

■ Ceco has established that the six-and-a-half month delay in completion of its subcontract caused it to incur additional expenses in three respects: First, a wage increase for union construction workers in the Philadelphia area went into effect in May of 1982; this prospective increase had not been factored into Ceco's pricing of the Carson–Ceco subcontract, since it was anticipated that the job would be done well before the wage increase. Second, extending the project for six months required Ceco to provide for certain additional supervisory personnel. Third, Ceco was required to maintain at the job site for six months more than planned approximately

forty flying-form "tables" which would otherwise have been available for use by Ceco on other construction projects.

The added costs incurred as a result of the first two factors are readily determined: the incremental wages flowing from the May 1982 wage increase cost Ceco $42,309; and the salaries of two full-time supervisory equivalents came to $58,878.

Costing out the loss Ceco incurred through six months of unavailability of forty "tables" is somewhat more complex: Ceco's initial job estimate calculation, enhanced to include Ceco's standard overhead and profit margin, yields a figure of $144,256. Rental value, likewise enhanced for overhead and profit, yields a figure of $184,577. The rental value approach seems more objectively reliable than proof based on Ceco's own internal job estimate. *Cf.* Restatement of Contracts, § 331(2), cited in *C.J. Langenfelder & Son v. Commonwealth*, 44 Pa.Cmwlth. 585, 404 A.2d 745, 753 (1979); compare Restatement (Second) of Contracts § 348(1). As Ceco acknowledges, courts using the rental value method customarily discount that value by 50% in calculating damages. *See Zook Bros. Construction Co. v. Montana*, 171 Mont. 64, 556 P.2d 911 (1976); *L.L. Hall Construction Co. v. United States*, 379 F.2d 559, 177 Ct.Cl. 870 (1966). The result, in this case, would be a figure of $92,288.[14] The sum of the three categories of added cost—$42,309 plus $58,878 plus $92,288—is $193,475.

Ceco, in its post-trial brief, "does not contend that this delay provision [Condition 20] automatically entitles Ceco, dollar for dollar, to all its expenses, costs and damages incurred due to delay; rather, by its own terms the provision entitled Ceco to 'a reasonable increase' in the contract price."

---

**14.** In the Joint Final Pretrial Order Ceco also claimed, as delay damages, (1) $12,195 as the cost of an extra bulkhead per floor (i.e., five rather than four consequent on the substitution of a five-day-per-floor pouring cycle for a four-day-per-floor pouring cycle), and (2) $4,490 for Ceco's loss of 200 manhours on the 22nd floor in mid-May of 1982 when Carson was unable to complete a scheduled pour. In Ceco's proposed findings, submitted after the trial, the first claim has been reduced to $10,207 and the second remains $4,490. However, Ceco now states that neither of these is a delay claim. Accordingly, they fall out of the purview of Condition 20. And, since Ceco points to no other contractual ground for imposing liability for these added costs on Carson, no damages will be assessed against Carson with respect to these two claims.

*Plaintiff's Brief Supporting Proposed Findings of Fact and Conclusions of Law* 15. I agree. In my judgment, the question of what increase is "reasonable" turns on two factors—the amount of the incremental costs, viewed as a function of the dollar bargain struck between the parties; and the extent of the time delay, measured against the performance timetable the parties had agreed upon.

The added cost found to have been incurred by Ceco—$193,475—is not, in the context of the Carson–Ceco subcontract, a trivial figure. It is almost exactly ten per cent of the subcontract price which, after change orders, amounted to $1,964,079; this closely approximates the standard profit factor built into the subcontract price. The extent of the time stretchout required to complete performance was far more substantial: taking eight-and-a-half months as the expected duration of the job, the additional six-and-a-half months enlarged Ceco's commitment by seventy-seven per cent of the time span originally anticipated.

Carson argues that the court, in assessing the six-and-a-half months' delay, should take into account the notorious capacity of construction projects to take longer than planned. I agree. Condition 20 does not undertake to protect against delays of a day or a week in a multi-month project; it is addressed to delays which require the subcontractor to continue operations to "a date substantially beyond the date contemplated for performance...." The record before this court does nothing to establish the meaning of "substantially" either as a matter of industry-wide practice or as a term which, at One Logan Square, could be said to have been given definition for each subcomponent of the project by reference to some over-arching view of the entire construction process taken as a whole. But the record does offer support for the inference that, at least from Ceco's perspective, the eight-and-a-half month calendar agreed upon with Carson was not simply a statement of good intentions but a performance target Ceco realistically planned to meet, almost to the day. Instructive in this regard is the testimony of Benjamin Botti who, on Ceco's behalf, conducted the initial negotiations with Anthony Samango, Carson's president, in the spring of 1981 (N.T., Day Three, p. 54):

Q. The question was, Mr. Botti, when you sat down and agreed upon the price on this job in late April 1981, whether you expected Ceco to be off the job before the effective date of the union's wage increase on May 1st, 1982?

A. Yes, we expected to be finished around the middle of February, 1982.

Q. I don't know, was there ever any discussion about that wage increase between you and Mr. Samango at the beginnings?

A. I don't know we specifically discussed the wage increase because it was not anticipated that we would come anywhere close to experiencing that wage increase.

Q. Did you make any allowance in your price for the possibility that you'd have to pay the men higher rates after May 1st, 1982?

A. No, we did not.

In the event, as described earlier in this opinion, Ceco was not enabled to get under way on June 1, 1981, as planned; Carson could not clear the decks for Ceco's operations until mid-July—a slippage which put off Ceco's completion target to approximately April 1, 1982. But this still left a cushion of a month before the May 1 wage increases. I find, therefore, that, in the context of the Carson–Ceco subcontract, any delay in excess of one month was "substantial." The delay beyond May 1 was five-and-a-half months—almost eighty-five per cent of the total delay. I conclude that a "reasonable" addition to the contract price is eight-five per cent of the added expense incurred by Ceco due to the delay. As stated above, that added expense was $193,475. Eighty-five per cent of $193,475 is $164,453. That is the sum to which Ceco is entitled as delay damages.

## II.

### *The Carson Backcharges*

Carson asserts a backcharge against Ceco of $398,046 for the cost of reposition-

ing approximately one-third of the 1397 steel inserts placed by Ceco in the exterior surfaces of each floor from the third floor through the thirtieth floor. The inserts in question—so-called "shear bar" inserts—were, in effect, steel hooks protruding outward from the building on which were to be hung the polished granite slabs which form the outer face or "skin" of One Logan Square. Each shear bar insert was six inches wide and two inches deep and was to extend four inches outward from the building. To make sure that the granite slabs were hung in proper relation to one another, it was necessary that the inserts be properly sited. The permitted tolerances were very demanding: ± ½ inch in extension outward from the building; ± ¼ inch vertically; and ± ½ inch laterally.

Starting in the spring of 1982, Turner became concerned over apparent errors in insert placement. Turner and Carson disagreed over whether the errors, or many of them, were attributable to mistakes made by Carson personnel in establishing proper "control lines" as pouring proceeded from floor to floor; these "control lines" were chalk lines drawn on the wooden deck, prior to pouring each concrete floor; their function was to provide a set of master reference points for the numerous and complex jobs of placement—including the installation of shear bar inserts—performed on each floor. After determining that 461 of the 1397 shear bar inserts were incorrectly placed, Turner caused repairs to be made at a cost of $398,046. That sum Turner sought to backcharge to Carson; and Carson in turn has sought to backcharge the same sum to Ceco. In 1984, as part of an over-all settlement by Turner and Carson of Turner's backcharges, Carson's assertion of delay damages as against Turner, and other claims, the backcharges item was resolved at a figure of $250,000—a resolution not disclosed by Carson then or for a long while thereafter. Ceco contends that Carson is, accordingly, estopped to seek more than $250,000 in backcharges from Ceco. I find no ground for concluding that either the fact of the Turner–Carson settlement or Carson's lack of candor about that settlement precludes

Carson from undertaking to establish (1) Ceco's alleged failure to fulfill its contractual obligation to Carson to site the inserts properly, and (2) the full damages allegedly suffered by Carson in consequence. On these issues, Carson, as counterclaimant, has the burden of proof.

Carson's claim rests on the fact that Ceco, as part of the Carson–Ceco subcontract, undertook performance of Carson's obligation to Turner to install the inserts. Carson charges that "the Ceco work force improperly placed the inserts in an unworkmanlike manner." *Carson Concrete's Proposed Findings*, quoted *supra*, at 33.

Carson's effort to demonstrate Ceco's "unworkmanlike" performance rests chiefly on two contentions. One is that Ceco personnel did a sloppy job making vertical measurements from points on the Carson control lines sixteen-and-a-half inches up the side of Ceco's edge forms to the place of insertion of the shear bars. The other is that Ceco personnel were apt to install shear bar inserts too high, and that this form of elevation error came about because proper placement of the inserts, flush with the concrete floor, was impeded by the presence of steel reinforcement bars—so-called "rebars"—over which the concrete was poured.

A. *Did Ceco Measurement Errors Cause The Mis-siting Of Inserts?*

██ As to Carson's first contention, the evidence of Ceco errors in measuring from the deck-level Carson control lines up the sides of the Ceco edge forms is scanty. Michael Preston, a Turner employee, did testify that he had observed the insert installation process performed by Ceco personnel "by eye" (Day 10, N.T. 45), but on cross-examination it turned out that the witness was referring to a single instance (Day 10, N.T. 88).

The more compelling evidence with respect to accountability for measurement errors is the following: The Carson control lines were derived by Carson personnel from registration points on ground-level control lines. This important function was entrusted to carpenters not well versed in

surveying; and it was performed at hours of the working day which were not uniform and not, on occasion, optimal (sometimes in semi-darkness, sometimes when cranes were operational and hence the structure was not stationary). William Barton, whose firm did the basic survey work and established the ground-level control lines at One Logan Square, was retained by Turner in 1982, to check, floor-by-floor, the Carson control lines and comparative control lines established by Turner personnel; this independent and enormously experienced witness concluded—and I find—that both the Carson and Turner control lines were flawed. As between Carson and Ceco, pursuant to Condition 19 of Form 110E Ceco had "no responsibility for establishing grades or general layout;" it was up to Carson to "establish all elevations, working points, angles and opening locations clearly marked on concrete or forms as required and ... verify same prior to pouring concrete." Condition 19 is part of the Carson–Ceco contract. See Part I(A)(1) of this opinion, *supra*. Consequences of flawed Carson control lines included (1) extension errors that were not random but reflected in the aggregate that many floors were significantly "out of plumb" to the north, and (2) lateral errors that also were not random but tended in the aggregate to march in a single direction.

B. *Was The Rebar Impediment Ceco's Fault?*

■ Carson's second contention—that proper installation of the inserts was impeded by the rebars—is more substantial. The testimony of Roger Ogilvie, a Ceco foreman, establishes that he brought the problem to Turner's attention on November 19, 1981, when the third floor was being poured. In March of 1982 recognition that

installation of inserts was a far more substantial chore than originally contemplated led Turner to agree to pay Carson $35 per insert installation; Carson, in turn, undertook to pay $12 per installation to Ceco, the actual installer.

The evidence does not establish how many inserts were sited too high because of the rebar impediment. But the evidence does establish that the total number could not have been more than a minor fraction of the 461 siting errors for which Turner backcharged Carson and Carson now seeks to backcharge Ceco. Only 52 of the 461 siting errors were errors of elevation alone.[15] Of those 52, approximately two-thirds were on floors in which edges were deliberately elevated to introduce a designed (but *not* by Carson or Ceco engineers) camber factor, and the designed camber factor turned out to be *overly* elevated.[16]

To the extent (and the extent is not documented) that the rebar problem did result in some inserts being sited too high, the fault lay not with Ceco. The rebars were, as to Ceco, a given: they were installed by "rodbusters" employed by Providence Steel which, like Ceco, was a sub-subcontractor of Carson's. But the root difficulty, as appears from the testimony of Ceco's expert, General Thomas H. Lipscomb, lay in the engineering failure to reconcile the two-inch depth of the insert and the one-and-a-half inch clearance between the uppermost rebar surface and the concrete floor surface with which the insert was to be flush. (December 18, 1986, N.T. 83–5). This engineering failure was outside Ceco's ken—and, very likely, outside Carson's as well. Ceco, as noted above, brought the resultant difficulty with respect to insert installation to Turner's attention in Novem-

15. See Testimony of General Thomas H. Lipscomb (December 18, 1976, N.T. 84–5). It should be added that some inserts were missited in more than one aspect—e.g., both extension and elevation; both extension and lateral; both lateral and elevation; or all three.

16. Camber—a slight convexity—was employed at corners of several floors where there were no supporting columns near the corners; the purpose of the camber was to compensate for the

downward gravitational pull on the unsupported edge portions of these cantilevered areas. The engineers calculating the camber overcompensated.

There is also evidence that the foundation of the building settled upwards of half an inch, which exceeds the ± $\frac{1}{4}$ elevation tolerance. The foundation was, of course, beyond the scope of the Carson–Ceco subcontract.

ber of 1981, three months after Ceco commenced work. Ceco did what it could with a problem not of its own making. Such elevation errors as may trace to the rebar problem were not Ceco's fault.

## C. *Summary*

In summary, Carson has failed to demonstrate by a preponderance of the evidence that Ceco is liable to Carson on Carson's counterclaim. Accordingly, the counterclaim will be dismissed.

### III.

The sum of what has been determined thus far is as follows: It was explained in the introductory portion of this opinion that there is a net contract balance which has been withheld by Ceco, the amount of which is undisputed: thus "[t]he starting point is an undisputed indebtedness of $401,334.74 running from Carson to Ceco." In Part I of this opinion I determined that Ceco had established its claim for delay damages, and that a reasonable award would be $164,453. And in Part II of this opinion I determined that Carson had not established its counterclaim and hence that it should be dismissed.

It remains to consider two further claims advanced by Ceco. The first is that Ceco is entitled to prejudgment interest of 6%, the statutory rate, on the $401,334.74 of net contract balance withheld by Carson. The second is that Ceco is entitled to attorneys' fees and other litigation-related expenses incurred in prosecuting this law suit.

## A. *Prejudgment Interest*

■ Ceco's claim for prejudgment interest is not seriously contested, nor could it be. The courts of Pennsylvania follow Section 354(1) of the Restatement (Second) of Contracts (Section 337(a) of the original Restatement). As the Superior Court observed in *Daset Mining Corporation v. Industrial Fuels Corporation*, 326 Pa.Super. 14, 473 A.2d 584, 595 (1984):

In contract cases, prejudgment interest is awardable as of right ... In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation.

Although Carson has not challenged the amount of the balance withheld, Carson has attempted to establish, through assertion of its counterclaim, a set-off substantially extinguishing the debt owing on the contract; but, as we have noted, Carson has not prevailed on the counterclaim. And "[u]nder Pennsylvania law, the mere fact that the amount of liability is contested does not mean that the amount is not liquidated." *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324, 332 (3d Cir.1980).

In Part I(A)(1) of this opinion I concluded "that Form 110E in its entirety is part of the Carson–Ceco One Logan Square subcontract." Paragraph G ("TERMS") of Form 110E provides as follows:

> G. TERMS:
>
> Contractor agrees to pay Ceco 90% of the contract value of work performed monthly on or before the 25th day of the following month up to 50% completion; thereafter Contractor shall pay Ceco 100% of the contract value of work performed monthly by the 25th day of the following month. The remaining 5% shall be paid within 90 days after substantial completion of the work under this contract.[17]

Carson should, therefore, have paid all but five per cent of the contract price to Ceco by mid-October of 1982, when Ceco completed performance of the subcontract. Carson was entitled to retain five per cent of the contract price for ninety days—i.e., until mid-January, 1983.

The contract price (including change orders) was $1,964,079 of which $401,334.74 remains due and owing today. Five per

---

**17.** The Carson letter to Ceco of June 8, 1981 (see note 2, *supra*) is consistent with, but not as precise as, paragraph G: the final paragraph of the letter calls for payment on the twenty-fifth of each month, with ten per cent retainage "on the first half of the contract", but it is silent on when the retainage is to be paid.

cent of the contract price is $98,200. That much of the balance Carson was entitled to defer payment of for ninety days beyond mid-October of 1982, (the date of "substantial completion of the work")—i.e., until mid-January of 1983. The remainder— $401,334.74 minus $98,200 = $303,134.74— should have been paid to Ceco in mid-October of 1982. Accordingly, Carson owes Ceco prejudgment interest of (1) six per cent on $303,134.74, commencing as of mid-October 1982, plus (2) six per cent on $98,-200, commencing as of mid-January 1983. In the Order accompanying this opinion, calculation of the precise amount of interest owing is remitted to the parties.

B: *Attorneys' Fees and Other Litigation Costs*

■ Ceco's claim for attorneys' fees and other litigation-related costs is based on Condition 26 of Form 110E:

In any action or proceeding brought to enforce any of the provisions of this contract, prevailing party shall recover the cost thereof, including attorney's fees, from the other party.

Since Form 110E "in its entirety" is an integral part of the Carson–Ceco agreement, and since Ceco is the "prevailing party," Carson must reimburse Ceco for the expenses Ceco reasonably incurred. In the order accompanying this opinion, the parties are directed to undertake to agree on the sum owing to Ceco. If the parties cannot agree, determination will be made by the court pursuant to such evidentiary presentation as may be required.

*Conclusion*

An appropriate Order accompanies this Opinion.

ORDER

For the reasons embodied in the Opinion filed today, it is hereby ADJUDGED:

1. Carson is liable to Ceco in the amount of $401,334.74, which figure is the net contract balance due and owing. Carson is also liable to Ceco for prejudgment interest on the foregoing figure; the parties are DIRECTED to make and submit to the court a joint calculation of the interest owing, such calculation to be in conformity with the guidance provided in the court's opinion.

2. Carson is also liable to Ceco in the amount of $164,453 in delay damages.

3. Carson's counterclaim against Ceco is DISMISSED with prejudice.

4. Ceco is entitled to reimbursement from Carson for attorneys' fees and other litigation costs incurred in the prosecution of Ceco's claims against Carson and the defense of Ceco against Carson's counterclaim. The parties are DIRECTED to consult with a view to reaching agreement on a joint calculation to be submitted to this court as to the amount of reimbursement Carson owes Ceco.

5. The parties will make the submissions to this court required by paragraphs 1 and 4 on or before February 29, 1988. Participation in these submissions will not estop either party from challenging any element of this court's decision by appeal or otherwise.

# APPENDIX A

DISTRICT OFFICE: 715 TWINING R ~SUITE 112, DRESHER, PA 19025 / PHONE: 21 .6-0311 'OFFICES IN PRINCIPAL CITIES

 **THE CECO CORPORATION** (FORMERLY CECO STEEL PRODUCTS CORPORATION)

**PROPOSAL and CONTRACT**

Proposal Number _____

Contract Number __1-35-15002 Re__

Date __October 14, 1981__

| | |
|---|---|
| Contractor/Buyer __Carson Concrete Corporation__ | Name of Structure __One Logan Square Office Buildin__ |
| Address __1217 Providence Road__ | Address of Structure _____ |
| __Media, Pennsylvania 19000__ | __Philadelphia, Pennsylvania__ |
| City State | City State |

This Agreement is made on the above date by and between The Ceco Corporation (hereinafter called "Ceco") and the above party (hereinafter call "Contractor/Buyer").

Ceco agrees to furnish for the above structure, and Contractor agrees to accept and pay for the following materials, labor or equipment in accordance with the following provisions

### SCOPE:

Ceco agrees to furnish reconditioned Ceco Steeldomes, Plyform, lumber, shores scaffold and labor for erection and removal thereof for forming the following items of concrete formwork for the above project:

1. All waffle flat slab (two-way), concrete joist construction on open wood centering. This includes all concrete joist construction from wall to wall, beam side to beam side, including flat beams that are within or adjacent to the concrete joist construction, solid concrete areas at columns, all of which are at the same elevation as the concrete joist soffits.

2. All reinforced concrete slab soffits outside the core areas.

3. The soffits and sides of deep beams.

4. All columns from the top of the footings up. All columns from the footings to the third floor and above the penthouse floor are to be poured free standing. All columns from the third floor to the penthouse floor are to be poured off the deck.

5. All slab edge bulkheads, bulkheads at architectural openings in slabs, bulkheads at mechanical openings in slabs as shown on plans, construction joint bulkheads, top of slab depression bulkheads, including furnishing and placing all chamfer. All the above items to be included within the scope of items 1 thru 4 above only.

110E 11/78

HE CECO CORPORATI N

Proposal Number _____

Contract Number __1-35-15002__

Date __October 14, 1981__

PROPOSAL and CONTRACT

A. SCOPE: (Continued)

6. In lieu of preprinted Condition Number 20, titled "Safety Barriers", the following shall apply:

Ceco shall install temporary guardrails on the form decks at the building perimeter and large openings. These guardrails will be removed when the forms are stripped. Permanent guardrails shall be promptly installed on completed floors by others.

7. Reshoring

8. Edgeforms and pour bulkheads in Ceco formed areas.

B. EXCLUSIONS:

This contract does not include:

1. Furnishing or installing forms for columns integral with walls, walls, stairs, intermediate stair landings, footings, pile caps, grade beams, bulkheads at mechanical openings not shown on plans, curbs, pads, lintels, sidewalks, drives, gutters, site work, wheelstops, ground slab bulkheads, forms on or abutting masonry, or forms for lightweight floor fills.

2. Furnishing or installing shear or wall keys, screeds, chases, permanent nailers, sleeves, ceiling clips, anchors, expansion joint fillers or devices, waterstops, reglets, and similar built-in items.

3. Forming "fill-ins" in otherwise completed floors or roofs, where temporary openings have been left for tower cranes, post-tension operations, raker beams, etc.

4. Taping or caulking joints. If specifications require joint taping or caulking, it shall be done by others.

5. Any forming in the core area (walls, slabs, beams, columns) for the ground floor through the main roof.

C. SPECIFIC PROVISIONS:

1. Ceco shall provide sufficient centering as required to form two maximum levels of concrete joist construction (approximately 38,000 square feet gross floor area) at one time, to be reused as necessary to complete all concrete joist framing.

2. Ceco shall provide approximately 2-1/3 floors of steel domes (3700 pieces) to be reused as necessary to complete all concrete joist forming.

3. Ceco shall provide sufficient material as required to form an area of beams at one time to complement item one above, to be reused as necessary to complete all deep beam forming.

HE CECO CORPORAT N

PROPOSAL and CONTRACT

Proposal Number _____

Contract Number ___1-35-15002___

Date ___October 14, 198___

C. **SPECIFIC PROVISIONS:** (Continued)

4. Ceco shall provide sufficient column forms to enable each lift to be made in five (5) pours to be reused as necessary to complete all column forming. Ceco shall provide a minimum of one floor of column forms from the third floor through the roof.

5. Ceco shall provide sufficient shores as required to reshore three typical levels (approximately 57,000 square feet gross floor area) of concrete joist construction, at one time based on 54 square feet per reshore.

6. Ceco shall use standard B-B Plyform and Ceco Steeldomes.

7. Ceco will install dovetail slot in beam and column forms if required by the plans and specifications, but the Contractor shall furnish same, stock piled on the floor level where it is to be used.

8. The Contractor shall provide sufficient unobstructed space for erection and removal of forms.

9. The Contractor shall pour columns free-standing and within a reasonable time after forms for same have been erected by Ceco in order that forms may be stripped and relocated without delay. Ceco shall be allowed to strip and relocate column and beamside forms 24 hours after same are poured.

10. This proposal is based upon the provision that pouring of concrete is to take place within a reasonable time after placement of forms. Reuse of forming materials is essential.

11. Ceco erection crews will dispose of their own debris and will not be responsible for pro-rata clean up charges. Ceco to place debris in dumpsters furnished and removed from site by Contractor at no cost to Ceco.

12. Sanitary facilities and drinking water are to be furnished by the Contractor.

13. All electrical lighting outlet boxes and/or conduit that are cast into the concrete topping above Ceco domes must be sealed off sufficiently to enable Ceco to use standard pneumatic procedures to strip the domes.

14. In lieu of preprinted Condition Number 5, titled "Hoisting", the following shall apply:

Contractor will provide Ceco free use of crane or other hoisting equipment (including the operating and maintenance personnel necessary for operation of the equipment) upon a mutually agreeable schedule for unloading at start, raising Ceco's forming and shoring materials from floor to floor and for loading on Ceco trucks upon completion of Ceco's work.

This contract is based on Ceco using a "flying" system. It is mandatory that Ceco have uninterrupted use of the crane during flying periods. Ceco will also require the free use of a crane to set 22 feet high column forms.

872

C. **SPECIFIC PROVISIONS:** (Continued)

 14. (continued)

 There shall be two climbing cranes as follows:

 One (1) crane located approximately between columns 24, 25, 26 and 27 PECCO model no. SK-355 with 140 lf. of boom. One (1) crane located approximately between columns 8, 9, 31 and 33. PECCO model no. SK-170 with 130 lf. of boom.

 15. This contract is based on a schedule that is to be mutually agreed upon between Carson and Ceco.

 16. When mudsills are to be placed for supporting concrete forms, a reasonably level and sufficiently compacted surface shall be furnished to Ceco by the Contractor.

 17. This contract is limited to forming structural elements shown on structural drawings only. All elements shown on architectural sections but not on structural drawings are specifically excluded.

 18. The Contractor shall provide sufficient time and space for erection, assembly and disassembly of the table system within reach of the crane service.

 19. This contract is based upon the provision that pouring of concrete is to take place on a four (4) working day schedule for typical tower floor after flying system is fully operational (four (4) pours per typical floor).

 20. This contract is based upon all mechanical, electrical, heating or air conditionings, plumbing, etc.. items being placed through sleeves. Where possible, this contract is based on the use of "race-way" sleeves with prefered location of sleeves being at column lines in "fill-in" areas rather than located at flying panels. No protrusions of more than three 3" shall be allowed at bottom side of floor. No penetrations thru the floor shall be allowed of more than 3" above the surfaces. Protection of these shall be by others. No attachments shall be made to panels without prior consent of Ceco or with devices not approved by Ceco.

 21. Floor area shall be kept free of material that obstructs the movement of the flying panels.

D. **PLAN REFERENCE:**

 This contract is based upon structural drawing nos. ST-1 thru ST-12, dated 3/23/81, with no specifications or addenda. as issued by Kohn, Pedersen, Fox Associates, subject to all clarifications stated hereinabove.

**HE CECO CORPORATI N**

PROPOSAL and CONTRACT

**E. OSHA:**

Ceco agrees that it, its agents, employees and sub-subcontractors, will perform the contractual obligations of Ceco in compliance with applicable regulations issued pursuant to the Construction Safety Act of 1969 and the Occupational Safety and Health Act of 1970. If Ceco discovers conditions that constitute potential violations of said regulations by any other party, but which may affect Ceco and its employees, Ceco shall immediately advise Contractor thereof; failure to correct such conditions shall justify the withdrawal by Ceco of its employees from the construction site until said conditions are corrected.

**F. PRICE:**

The Contractor agrees to pay The Ceco Corporation in current funds for the performance of the above described work, the lump sum of ONE MILLION EIGHT HUNDRED TWENTY SIX THOUSAND DOLLARS ($1,826,000.00).

The above price does not include any "embedments". Ceco shall install the following items at the indicated unit prices. All embedments are to be furnished to Ceco on the floor on which they are to be installed in sufficient time to enable their installation prior to installation of the rebars.

1. Dovetail Slot $.40 per lin. ft.

2. Wedge Inserts in Slab Edge $2.15 each.

3. Precast Inserts $3.00 each.

**G. TERMS:**

Contractor agrees to pay Ceco 90% of the contract value of work performed monthly on or before the 25th day of the following month up to 50% completion; thereafter Contractor shall pay Ceco 100% of the contract value of work performed monthly by the 25th day of the following month. The remaining 5% shall be paid within 90 days after substantial completion of the work under this contract.

# THE CECO CORPORATION

PROPOSAL and CONTRACT

Proposal Number _____

Contract Number ___1-35-15002 !___

Date ___October 14, 1981___

## CONDITIONS

1. **Drawings.** Ceco agrees to provide all drawings or details nec essary for the proper performance of this contract, and approval of such drawings or details will constitute authority for Ceco to proceed, as scheduled, in accordance therewith.

2. **Delay.** Ceco will not be responsible for delays in performance caused by delays due to strikes, jurisdictional disputes, disputes between union and non-union personnel, shortages of material and equipment, fires, acts of nature, wars, or other circumstances reasonably beyond Ceco's control. In the event of delays beyond Ceco's reasonable control, the time set for performance shall be extended for a period equivalent to the period of delay, and Ceco shall not be liable for damages for such delay. In the event of substantial delay in the progress of the work, for which Ceco is not responsible, Ceco shall have the right to remove its equipment upon two weeks' notice If, as a result of circumstances beyond its reasonable control, Ceco is delayed in, or prevented from, performance of this contract until a date substantially beyond the date contemplated for performance, and thereby incurs expense or suffers loss or damage, there shall be a reasonable increase in the contract price

3. **Overtime.** This contract is based on a standard work week consistent with area practice. Ceco agrees to work overtime Saturdays and Sundays, to the extent that it can reasonably procure workmen to do so, when so requested by the Contractor. The premium pay for such overtime, plus any insurance, tax, welfare, or other payments based upon the premium pay shall be paid to Ceco by Contractor unless Ceco shall be behind the progress schedule agreed to by Ceco for reasons entirely within Ceco's reasonable control

4. **Clean Up.** Ceco agrees to keep the premises at all times free from abnormal accumulations of Ceco's waste material, and at the completion of the work, to remove all Ceco tools and surplus materials from the project site.

5. **Hoisting.** If Ceco's work requires the use of hoisting equipment, the Contractor shall provide Ceco with the use of an elevator, crane, or other required hoisting equipment, including the operating and maintenance personnel necessary for the operation of the equipment, without cost to Ceco. Hoisting shall include un loading and loading of trucks.

6. **Utilities.** The Contractor shall provide without cost to Ceco adequate current plans and specifications, lights, and electrical power, to include ground-fault circuit protection on all receptacle outlets when required by OSHA standards. An adequate work space at the jobsite for form makeup, reworking and storage will also be provided.

7. **Bonds.** Ceco agrees to furnish, if required, a surety bond acceptable to, and in an amount set by, Contractor, covering the faithful performance of the contract and the payment of all obligations arising thereunder, the premium to be paid by the Contractor unless otherwise specifically provided in this contract.

8. **Indemnity.** While Ceco will hold Contractor and Owner harmless from claims caused by Ceco's negligence, Ceco assumes no responsibility for negligence of Contractor or Owner

9. **Liability Insurance.** Ceco agrees to provide and maintain in full force and effect during the term of this contract, liability insurance (including insurance covering the operations of vehicles) with limits of liability as required by the Contractor, protecting against liability from damages because of injuries, including death, suffered by persons other than employees of Ceco, and against liability from damage to property when such injuries or property damage arise from and grow out of Ceco's negligent acts or omissions in the performance of this contract. Ceco will also provide and maintain Workmen's Compensation, Occupational Disease, and Employer's Liability insurance in compliance with Workmen's Compensation Acts and related laws. Ceco will furnish the Owner or Contractor or both, as required, with a Certificate of Insurance evidencing that this coverage is in effect, and a ten days advance notice will be given to the party or parties to whom the Certificate is addressed of any material change in, or cancellation of such insurance.

10. **Builders' Risk Insurance.** The Contractor agrees that the Contractor or Owner will procure Builders' Risk Insurance without cost to Ceco covering Ceco's formwork, labor of reinstalling formwork, and equipment (not including theft of hand tools) at the site from loss or damage caused by fire or standard extended coverage perils and Ceco shall receive a share of any payments of loss under any such policy or policies as its interests may appear.

11. **Waivers.** Ceco will issue waiver of lien or bond rights only at time of payment.

12. **Equipment.** Ceco agrees to furnish, for Ceco's exclusive use only, all tools, equipment, and supplies necessary for the performance of this contract. Contractor may not use any of Ceco's equipment or materials without written consent of Ceco. Any usage of Ceco's equipment or materials shall be with the understanding that Contractor uses said equipment or materials at his own risk, and takes the equipment or materials in an AS IS condition.

13. **Title to Forming Material.** All forms, shores, centering and other forming material remain the property of and in the possession of Ceco and Contractor shall be responsible for any damage to any forms other than ordinary wear and tear caused by Contractor or his other subcontractors. Cutting of holes in Ceco Steelforms for any purpose shall not be considered as ordinary wear and tear.

14. **Installation Approval** All forms are subject to Contractor's approval after installation, and if they are used as installed, Contractor's approval is implied.

15. **Concrete Finish.** Ceco will not be responsible for any chipping, rubbing, grinding, retouching, patching, or otherwise finishing of any concrete surfaces, nor loss of concrete caused by mechanical vibrators unless caused by a Ceco formwork failure.

16. **Form Coating.** Ceco will be permitted to coat forms with a release agent before placing of steel or other materials

17. **Attachments to Forms.** All attachments to Ceco steel or fiberglass forms must be done with a special drive rivet which is available through Ceco The attachment of any item by sheet metal screws is prohibited.

18. Mudsills. When mudsills are to be placed for supporting concrete forms, a reasonably level and sufficiently compacted surface will be furnished to Ceco by the Contractor

19. Grades. Ceco assumes no responsibility for establishing grades or general layout. The Contractor shall establish all elevations, working points, angles and opening locations clearly marked on concrete or forms as required and shall verify same prior to pouring concrete.

20. Safety Barriers. Ceco assumes no responsibility for erecting and maintaining protective devices or barriers around openings and/or at the perimeter of the building on formwork and completed slabs, but will repair or replace any such devices damaged by Ceco. Should the Contractor, Governmental Agency or others require Ceco to furnish and/or erect any such protective devices or barriers, the Contractor shall reimburse Ceco for all costs incident to same.

21. Termination. If work on the structure is terminated before completion of this work, this contract shall terminate; and Contractor shall pay Ceco for all engineering or drafting services, materials shipped and work performed plus a reasonable profit.

22. Assignment Neither party shall assign this contract or sublet it as a whole without the written consent of the other.

23. Modifications. This contract cannot be modified except by a writing signed by both of the parties.

24. Entire Agreement. This writing is intended by the parties as a final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement.

25. Effective Date. This contract shall become effective either when signed and delivered by Contractor to Ceco and accepted in writing by Ceco at its home office or when Contractor orders commencement of the work under this contract.

26. Enforcement Costs. In any action or proceeding brought to enforce any of the provisions of this contract, prevailing party shall recover the cost thereof, including attorney's fees, from the other party.

TERMS: Contractor agrees to pay Ceco 90% of the contract value of work performed monthly on or before the 15th day of the following month and pay the remaining 10% within 30 days after substantial completion of the work under this contract.

TAXES: Unless specifically included in the price above, the amount of any applicable sales, use or comparable tax on receipts which Ceco may be required collect will be added to each invoice.

**Carson Concrete Corporation**
Contractor

By

**THE CECO CORPORATION**
Proposed

By A. P. Cuno

Approved at Ceco's home office

By